## Case No. 6.282.

### HAZARD v. NEW ENGLAND MARINE INS. CO.

[1 Sumn. 218.] [1]

Circuit Court, D. Massachusetts. Oct. Term, 1832.[2]

MARINE INSURANCE — ABANDONMENT — COPPERED SHIP—HOW UNDERSTOOD—PERIL OF SEA.

1. Semble. To make an abandonment effectual, the cause of the loss of the ship must be stated in the letter of abandonment, for the benefit of the underwriters.

[Cited in Marble v. City of Worcester. 4 Gray, 395; Cummer v. Butts, 40 Mich. 325.]

2. Where, in a written application for insurance on a ship, she is represented as "a coppered ship," the meaning of this representation is to be understood according to the ordinary sense and usage of these terms in the place, where the insurance is made; unless the underwriter knows, that a different sense and usage prevail in the place, in which the ship is then lying, and in which the owner resides, and from which he writes, asking for the insurance; or has some other knowledge, that the owner uses them in a different sense from that, which prevails in the place, where the insurance is made.

[Cited in Foye v. Leighton, 22 N. H. 76; Martin v. Maynard, 16 N. H. 167; Cummer v. Butts, 40 Mich. 325.]

[See note at end of case.]

3. If the underwriter has been misled in a matter material to the risk, by supposing the terms of the representation used in the sense of the place, where the application was made, and if the policy was underwritten by mistake, founded on such supposition, and the owner, who procured the insurance, intended to use the terms in a different sense, then the policy is void, as founded in mutual mistake.

[Cited in Gibson v. Pelkie, 37 Mich. 381; Widner v. W. U. Tel. Co., 51 Mich. 297, 16 N. W. 653; Wardell v. Williams, 62 Mich. 56, 28 N. W. 796.]

4. It is essential to the validity of a contract, that the parties to it should have consented to the same subject matter in the same sense; they must have contracted ad idem.

[Cited in Hughes v. Mercantile Mut. Ins. Co., 55 N. Y. 268; Van Buren Ry. Div. v. Lamphear, 54 Mich. 582, 20 N. W. 594.]

5. A loss of a ship by worms in an ocean, where worms ordinarily assail and enter the bottoms of vessels, is not a peril of the sea within the policy.

[Cited in Dix v. Union Ins. Co., 23 Mo. 60.]

[Cited in Nelson v. Suffolk Ins. Co., 8 Cush. 499.]

6. Where a ship sustained an injury at the Cape de Verd Islands, in the loss of her false keel, whereby she became exposed to the action of the worms, which obtained entrance into her in the Pacific Ocean, and destroyed the ship, the loss does not come within the policy, it being a consequential injury. In this case, the master should have caused the ship to be repaired; and in not doing so, he was guilty of negligence, which exonerated the underwriters from the subsequent loss by worms, which was occasioned thereby.

[Cited in General Mut. Ins. Co., v. Sherwood, 14 How. (55 U. S.) 358; The Queen, 28 Fed. 760; The Giles Loring, 48 Fed. 469.]

[Cited in Merchants' Mut. Ins. Co. v. Sweet, 6 Wis. 673.]

[1] [Reported by Charles Sumner, Esq.]
[2] [Reversed in 8 Pet. (33 U. S.) 557.]

Assumpsit on a policy of insurance, dated 26th December, 1827, whereby the defendants caused to be assured Josiah Bradlee & Co., for Thomas Hazard, Junior, of New York, fifteen thousand dollars on the ship Dawn, and outfits, at and from New York to the Pacific Ocean and elsewhere, on a whaling voyage, during her stay and fishing, and until her return to New York, or port of discharge in the United States, with liberty, &c. The declaration contained various counts, stating a total loss of the vessel, and a partial loss of the cargo, and also a partial damage to the vessel by perils of the seas. It appeared, in evidence, that the vessel sailed on the voyage on the 29th of December, 1827; and on her outward passage struck upon a rock at the Cape de Verd Islands, and knocked off a portion of her false keel; but proceeded on her voyage, and continued cruising, and encountered some heavy weather, until she was finally compelled to return to the Sandwich Islands, where she arrived in December, 1829, in a very leaky condition. Upon an examination by competent surveyors there, she was found to be so entirely perforated by worms in her keel, stern, and stern-post, and some of her planks, as to be wholly innavigable; and, being incapable of repair at that place, she was condemned and sold. It also appeared in evidence, that after the ship had sustained the injury at the Cape de Verd Islands, she put into St. Salvador, and that, both at the Cape de Verd Islands and St. Salvador, her bottom was examined by swimmers, and reported not to be materially injured.

C. G. Loring and Webster, for defendants, contended: (1) That there was a misrepresentation of a fact material to the risk, in the application made for the insurance, which was by letter, and in which the vessel was represented to be a coppered ship. That, by the terms "coppered ship," applied to a vessel destined upon a whaling voyage in the Pacific Ocean, it would be understood, according to the usages of insurance in Boston, that the sides and bottom of her keel were covered with copper; and they adduced evidence to prove this position, and also that the keel of this vessel was not so covered. And upon this point the plaintiff [Samuel Hazard], produced evidence to prove, that the keel was so covered; or, if not, that it was, nevertheless, covered with leather, which was alleged to afford an equally permanent and effectual protection against worms. (2) Another point of defence was, that there had been no sufficient legal abandonment. (3) A third point was, that a loss by worms was not a loss within the policy; and for this was cited Martin v. Salem Marine Ins. Co., 2 Mass. 424; Hughes, Ins. 218; Phil. Ins. 251. (4) Another point was, that if the loss by worms was a consequence of the injury done at the Cape de Verd Islands, it was too remote to entitle the plaintiffs to

recover; that the injury ought to have been repaired by the master, and if he neglected it, a subsequent loss by his neglect was not chargeable to the underwriters. (5) Another point was, that the ship was unseaworthy, it being alleged, that the copper was put on over old leather, and so was not sufficiently fastened; but this point was not much pressed. (6) Another point was, that, if there was not a total loss, there could be no recovery for a partial loss, as the damage by perils insured against did not amount to five per cent.; but the plaintiff's counsel did not contend for a partial loss.

The plaintiff's counsel, (W. Sullivan and Selden,) on the other hand, contended (1) that there was a sufficient abandonment; (2) that there was no misrepresentation; (3) that the loss by worms was within the policy; (4) if not generally, it was under the circumstances of this case; (5) that the ship was seaworthy.

It is not thought necessary to report the arguments at large, as they are fully commented on by the court.

STORY, Circuit Justice (charging jury). The first question arising in this case is, whether the abandonment is sufficient in its form and substance. The letter of abandonment is dated the 28th of July, 1830, and after stating that a letter had been received from Captain Gardiner, the master of the vessel insured, of which it annexes a copy, adds, we hereby abandon to the underwriters on that ship and outfits, the interest insured. The letter of Captain Gardiner states nothing farther in relation to the loss of the ship, than is contained in the following passages: "The unfortunate situation I have been placed in by the failure of the ship Dawn, and all the particulars relative to my transactions, will be forwarded to you in a duplicate by Mr. S. R., whom I have authorized to that effect, by the earliest opportunity. I have shipped, on account of ship Dawn, 38,800 gallons of sperm oil; quantity obtained 53,541 gallons. The ship was stripped, sold in lots, also her stores, provisions, &c. The nett amount of sales was $6496.74; disbursements during the voyage, and expenses at this place have been about $5000." The objection to the abandonment is, that there is no statement of the cause of the loss, so as to show, that it is by a peril within the policy, for which an abandonment may justly be made. I confess, that I have always understood the law to be, that in an abandonment the cause of the loss must be stated, so that the underwriter may know, whether it is a loss by a peril within the policy, and may exercise his judgment upon the facts, whether to accept or refuse the abandonment. Nor do I well see, how an abandonment can be made without stating a case justifying the act. It seems difficult to see, in the present abandonment, any distinct statement of a loss by any peril insured against. The only allegation is, that there has been a failure of the ship; but this may be from causes wholly without the perils of the policy. The ship may have failed from the mere waste and decay incident to the voyage, without any extraordinary peril. Still, as there are other most important points in this case, whatever my own opinion may be, I shall for the purposes of the trial rule, and I do accordingly rule, that, under all the circumstances of the case, the abandonment is sufficient in point of law.

The next question is, whether there has been a false representation in any thing material to the risk. The letter of instructions, of the 22d December, 1827, under which the policy was procured to be underwritten, asserts, "She (the ship) has been newly coppered to light water mark, above which she is sheltered with leather to the wales, and fitted in every respect in the best manner," &c.; and insurance was asked on the vessel for a whaling voyage. Now, I may state at once to the jury, that the representation of facts, stated in this letter, so far as they were material to the risk, must be substantially true. If the ship was not coppered, as stated in that letter, and she did not in that respect correspond with that representation, and the difference between the facts and the representation was material to the risk, then the plaintiff is not entitled to recover upon the policy. But I shall leave the facts, as to the representation and its materiality to the jury. The words in the letter represent the ship to be newly coppered to light water mark. The underwriters insist, that the ship was not coppered according to this representation; and it is for the jury to determine, what constitutes a coppered ship. If the jury shall find from the evidence, that, in order to constitute what is called a coppered ship, the bottom of the keel and the sides of the keel, as well as the sides of the vessel, must be coppered; and if they should farther find from the evidence, that this ship was not so coppered, and the deficiency was material to the risk, then there was not a compliance with the terms of the letter left with the underwriters, and the latter are not liable upon the policy. Or, if the jury should find from the evidence, that a ship coppered on her sides and also on the sides of her keel, and not on the bottom of the keel, or false keel, would meet the representation of a coppered ship on other voyages; but that, in whaling voyages in the Pacific Ocean, the usual and customary mode is to copper the bottom or false keel, and it is understood by underwriters, when application is made for insurance on such voyages, that the vessels are so coppered, unless the contrary is stated; then, inasmuch as the letter applying for insurance is an application for insurance of a vessel on a whaling voyage in the Pacific Ocean, the underwriters had a right to consider the representation in the letter, as describing the

vessel as coppered in the manner, in which vessels are usually coppered for such voyages; and if the ship was not so coppered, and that deficiency was material to the risk, the terms of the letter were not complied with, and the defendants were not bound by the policy.

It has been argued on behalf of the plaintiffs, that the representation in the letter, as to the ship's being coppered, is to be construed and decided by the meaning of those terms in the port of New York, where the letter was written, and the owner resided, and where the voyage was to commence and end; and not by the meaning of the words in Boston, where the insurance was made, although the latter was the only sense, in which the underwriters could or did understand the terms, at the time when the insurance was made. I am decidedly of a different opinion; and I think the doctrine utterly irreconcilable with the first principles in the interpretation of contracts, and especially of contracts governed by the lex loci contractus. In my judgment, it is wholly immaterial, as to this point, where the owner resided, or where the letter was written, or where the voyage was to commence or end. This is not a question as to the usage of trade in a particular port, with reference to a particular voyage, or of seaworthiness for such a voyage. The question is not here, whether the ship was seaworthy for a whaling voyage according to the usage of the port, where the voyage was to begin and end. She might have been so, for aught I know, in the port of New York, without such entire coppering of the whole keel, as the underwriters now contend for. And if there had been no representation at all of the fact, if the vessel had been seaworthy for the voyage according to the usage of New York, the underwriters would have been bound by the policy. But, here, there is a positive representation of a fact; and whether that fact be or be not necessary to seaworthiness, is of no consequence, if it is still a fact material to the risk, and in regard to which the underwriters have been misled by the representation. The fact of extra-seaworthiness may with them constitute a solid reason for underwriting the policy. A fact indicating superior and extraordinary safety, or uncommon protection from danger, by very excellent equipment, seamanship, or structure, may, as a fact leading to a decrease of the risk, be the very inducement to take the policy. An old ship may be seaworthy; but she may not be as safe as a new ship; and if an old ship is represented as a new ship, and it is material to the risk, though the old ship be seaworthy, can it be that the underwriters are bound? Here, then, the underwriters are in Boston; the proposal is offered, and the letter is shown, and the representation is made in Boston; the policy itself is underwritten in Boston; and it is a contract made and to be executed in Boston, and, of course, is to be construed by the law of Massachusetts, and the meaning and usage of words in that state. If any thing is settled, as to the operation of the lex loci contractus, I think this principle is. According to the usage of the terms in Boston, (I will suppose for the purpose of the argument,) the words, "coppered ship," mean a ship coppered on her whole keel and false keel, as well as on her sides; and especially in whaling voyages, a coppered ship is always so understood by all persons in Boston. The underwriters have not the slightest knowledge, that a different meaning is attached to the words elsewhere, and especially not in New York. They underwrite the policy upon the faith of the representation, that the ship is a coppered ship, in the only sense of the terms known to them, or which they have the slightest reason to conjecture. The owner gives them no information, that he uses the words in a different sense; and the very agent in Boston, who procures the insurance, and to whom the uniform sense of the words in Boston must be equally well known, is silent in regard to any difference. If the agent had by parol asked for the insurance in Boston, and made at the time a parol representation, that the ship was a coppered ship, must he not be deemed to represent her to be so in the Boston sense of the words? And if so, can it make any difference, that the representation is made in writing in the same place? I do not say, that the owner, or the agent, practised a fraud upon the underwriters by procuring a policy under such circumstances, by misleading the underwriters. All the parties may have been equally innocent. The owner in New York may not have been aware, that the meaning of "a coppered ship" in Boston, is different from the meaning of such a ship in New York. The agent in Boston may have been equally as ignorant, as the underwriters, in regard to the New York sense. What, then, under such circumstances, would be the consequence? Plainly, that it would be a contract founded in mutual mistake; and therefore neither party would be bound by it. They would not have contracted ad idem. There would never have been an agreement to the same subject matter in the same sense. This principle is so well known and so familiar, that it may now be deemed to be treasured up among the elements of jurisprudence. See Pothier on Obligations, by Evans, volume 1, p. 12, art. 3, §§ 17, 18. I have no difficulty, therefore, in directing the jury, and I do accordingly so direct, that, in ascertaining what is to be understood as a coppered ship, in applications for insurance on a voyage of this nature, the terms of the application are to be understood according to the ordinary sense and usage of those terms in the place, where the insurance is asked for and made, unless the underwriter knows, that a different sense and usage prevail in the place, in which the ship is then lying, and in which the owner resides,

and from which he writes asking for the insurance; or unless the underwriter has some other knowledge, that the owner uses the words in a different sense and usage from that, which prevails in the place, where the insurance is asked for and made. And if the underwriters have been misled, in a matter material to the risk, by the terms of the representation, by supposing them used in the sense of the place, where the application was made for insurance, and if the policy was underwritten by mistake, founded on such supposition, and the owner, who procured the insurance, intended to use the terms in a different sense, then the policy is void, as founded in mutual mistake. But the questions, whether there has been any misrepresentation by mistake or otherwise, and whether, if made, it was material to the risk, are questions exclusively for the jury to decide upon their own view of the facts.

It has been said, that the terms of the letter, on which the insurance was made, do not amount to a warranty, and therefore, that they need not be strictly correct; but that it is sufficient if they are true in substance; and it need not be proved, that the ship was wholly coppered on the sides and bottom of the keel. I agree, that the terms of the letter do not import to be a technical warranty. But still, if the coppering of the ship, as stated in the letter, was substantially untrue and incorrect in a point material to the risk, the misrepresentation would discharge the underwriters, although the ship was partially coppered, and although the loss did not arise from deficiency in the coppering.

The next point in the defence is, that the loss did not arise from any perils insured against. The allegations in the declaration are, that the ship was lost by the perils of the seas. The proof is, that she was in fact destroyed, so as to be unfit to perform her voyage, by worms in the Pacific Ocean. The evidence, so far as it bears on this point, is to the following effect. The ship on her outward voyage struck upon a rock at or near the Cape de Verd Islands, and knocked off a portion of her false keel, and a small piece of her fore foot attached to it. At the Cape de Verds the master sent a good swimmer under the ship, to examine her. He reported, that the accident had hurt the ship only in the place, where the false keel was taken off; and that the copper was not broken. The master, therefore, did not think it necessary to make any repairs at that place, and did not make any; but sailed on the voyage. He afterwards stopped at St. Salvador, where he had the bottom of the ship examined again by good swimmers; and, from the examination, he supposed her competent to go on the voyage, and that the piece torn off from the keel had not injured her. The ship afterwards proceeded to the Pacific Ocean, and encountered some gales, and engaged for some months in the whaling business. The master finding the ship leak badly, sailed for the Sandwich Islands. Upon her arrival there, he caused a survey to be made, when it was found, that the keel of the ship was almost entirely perforated by worms, and destroyed; her fore foot and the greater part of her false keel were gone; her stern-post injured; and for the most part her sheathing and copper entirely gone; and many parts of the plank of the bottom were destroyed; and she was accordingly condemned as unworthy of repair. The immediate cause of the loss seems, by the course of the argument, admitted to have been the perforation of the keel by worms. Whether the keel was, or was not coppered on the sides, has been much contested, and the evidence is contradictory. But it seems admitted, that the bottom of the keel was not coppered, but only covered with the leather; and the sides of the keel, if not coppered, were also covered with leather.

The question is, whether a loss by worms is, in the sense of the policy, a loss by the perils of the seas. If the jury shall find from the evidence, that in the Pacific Ocean worms ordinarily assail and enter the bottoms of vessels, then, in my opinion, a loss of the ship by worms, under such circumstances, in that ocean, is not a peril of the seas within the meaning of the policy. The policy is intended, not to cover ordinary perils, in the nature of wear and tear, in the voyage; but extraordinary perils. If the question were entirely new, I should upon principle adhere to this doctrine. But it appears to me, that it is fully settled by authority. This is a policy underwritten, and to be executed in Massachusetts; and therefore it is to be treated as a Massachusetts contract. It has been decided in the courts of this state, that damage, arising from an injury by worms, is not a loss within the policy (Martin v. Salem Marine Ins. Co., 2 Mass. 421. See, also, Rohl v. Parr, 1 Esp. 444; Benecke, Ins. 456; Hughes, Ins. 218; Phil. Ins. 251; Hunter v. Potts, 4 Camp. 203); and my opinion is, that underwriters in Boston must be deemed to contract in reference to this course of decision; and that consequently they are not liable for losses occasioned by worms.

But, it has been contended on behalf of the plaintiffs, that, even admitting that the destruction of the ship has been by worms, and that such a loss is not, under ordinary circumstances, a loss within the policy; yet it appears by the evidence in this case, that the access of the worms to the keel was owing to the accident and damage done to the keel at the Cape de Verd Islands, by striking against a rock; and that under these circumstances the ultimate loss is to be attributed to this accident, and so is a loss within the policy. It is added, that in all cases, where the loss is inevitable in consequence of the accident, the loss is properly immedi-

ate, although it may not in point of time happen until long afterwards. In other words, a loss is deemed immediate, not because it happens eo instanti, but because it is inevitable. And examples have been put at the bar in illustration of this doctrine. My opinion is, that in no just sense can this loss, if by worms, be deemed a loss immediate upon the accidental injury alluded to. The general rule in cases of insurance is, that the loss is to be attributed, not to the remote, but to the immediate cause. "Causa proxima, non romota, spectatur." The injury by striking on the rock at the Cape de Verd Islands, might have been the occasion, or even the remote cause, of the loss of the ship; but it was not the immediate cause. The immediate cause was the perforation of the keel by worms. The loss happened many months after the accident. I have, therefore, no difficulty in stating to the jury, that if, in consequence of the injury sustained at the Cape de Verd Islands, the false keel was torn off, whereby the ship became exposed to the action of the worms, and that they thereby obtained entrance, and destroyed the ship, the loss would not come within the policy, it being a consequential injury, against which the underwriters are not considered as taking the risk.

But an additional answer to this part of the case has been given by the counsel for the defendants, upon which it becomes my duty to express an opinion. It is said, that, even if the loss could be thus traced back immediately to the accident at the Cape de Verd Islands; yet the underwriters would not be liable, because it was the duty of the master, if he could, (and it is not shown, that he could not,) to repair the damage so done; and if he did not, the subsequent loss is properly attributable to his negligence; and that the underwriters are not liable for a loss by worms occasioned by such negligence. Upon this point my opinion is, that if the injury at the Cape de Verd Islands was repairable, and could have been repaired there, or at St. Salvador, or at any other port at which the ship stopped in the course of her voyage, it was the duty of the master, and he was bound, to cause such repairs to be made, if they were material to prevent a loss. And if he omitted to make such repairs, because he did not deem them necessary; and if by such neglect alone the subsequent loss by worms was occasioned, the underwriters are not liable for the loss so occasioned.

The court have also been called upon by the plaintiff's counsel to instruct the jury as follows; first, that if the jury believe, that the underwriters would not have charged a higher rate of premium, if the vessel had been correctly represented, than they did charge, and that the insured had not intentionally misrepresented the facts, then the representation is not material, and does not defeat the policy; secondly, that if they believe, that the object of coppering the bottom of the keel is to protect against worms, and if they also believe the leather an equal protection, and that it was put on, in that case the letter would not be considered a material misrepresentation. I feel myself compelled to refuse to give the instructions in the terms prayed. But upon the first point, I am of opinion, and so direct the jury, that if the fact stated was not material to the risk, and would not have varied the conduct of the underwriters, either as to the premium of insurance, or as to underwriting the policy at all, if the fact had been correctly represented, and the insured has not intentionally misrepresented the facts, then the misrepresentation will not prevent the insured from a recovery in this case, or defeat the policy. And on the second point, I direct the jury, that if the object of coppering the bottom of the keel was to protect it against worms, and if they believe, that leather is an equal protection, still, if the fact was, that the letter of instructions did contain a representation, which was and might have been understood as representing, that the keel was coppered, and if that fact was material to the risk, and might have induced the underwriters to ask a higher premium, or not to have underwritten at all, then the misrepresentation of its being coppered, when it was leathered, would avoid the policy. But if it was not a fact material to the risk, and would not have changed the conduct of the underwriters, either as to underwriting at all, or as to asking a higher premium, then the misrepresentation would not avoid the policy.

With these directions, after summing up, and commenting on the facts, the judge left the cause to the jury, who found a verdict for the defendants, upon which judgment was rendered accordingly.

NOTE. A bill of exceptions was filed, and the cause was carried by a writ of error to the supreme court, where, upon argument at January term, 1834, the judgment was reversed for error in stating, that the letter of instructions, under which the insurance was made, was to be understood according to the sense of the terms "coppered ship," as known and used in the place (Boston) where the insurance was applied for and made. But upon all the other points in the case, the directions of the court were held to be correct. 8 Pet. [33 U. S.] 557.

———

HAZEL (NICHOLLS v.). See Case No. 10,230.

HAZEL (SMITH v.). See Case No. 13,055.