## OVERMAN AND BROWN v. KERR.

1. Deed: DELIVERY. A joint deed for the conveyance of all the interest of joint owners of real estate was executed by the grantors and delivered to a notary to be delivered to the grantee when executed by the other grantor: *Held*, not a complete delivery, even by the parties who executed it.

2. —— AS A CONTRACT TO CONVEY. An instrument not sufficiently delivered to be valid as a deed cannot be treated as sufficiently delivered to be enforced as a contract to convey.

3. Contract: ASSENT. To render a contract binding, it must be assented to by both parties.

4. Commissioners: POWER TO CONTRACT. The commissioners appointed by chapter 5, Laws of 1853, to locate the county seat of Blackhawk county had no power to bind the county by contracts with owners of lots to cause public buildings to be erected thereon, or pay the value of the property upon the removal of the county seat.

— [COLE, J., dissented from the finding of facts upon the evidence set out in the record, but took no exceptions to the principles of law announced by the court.]

*Appeal from Blackhawk District Court.*

SATURDAY, DECEMBER 10.

THIS is an action at law by the plaintiffs to recover possession of lot 2 in block 14 in the village of Cedar Falls. The material facts may be compressed, so far as necessary to understand the questions discussed by counsel and decided by the court, as follows:

The legal title is admitted to be in the plaintiffs, unless the deed of June 7th, 1853, hereinafter alluded to, was delivered. But, however this may be, the defendant claims an equitable title, arising out of the following facts:

On the 22d day of January, 1853, the legislature (see Acts, 1853, ch. 51, p. 85) appointed A. J. Lowe, S. S. McClure and Edward Brewer "commissioners to locate and establish the seat of justice of Blackhawk county." The act prescribed the time and place of meeting, and required the commissioners to take an oath "faithfully and impartially to locate the county seat of Blackhawk county according to the best interests of said county, taking into consideration the future as well as the present population of said county." This comprises the whole extent of the powers of the commissioners, as expressed in the appointing act.

The plaintiffs in this action, John M. Overman, Wm. P. Overman, D. C. Overman and Edwin Brown, were large proprietors of lots in Cedar Falls, in Blackhawk county, and were desirous that the county seat should be located at that village. To induce the commissioners to locate it there, the plaintiffs proposed to donate to the county fifty (50) lots. They signed a written petition making this offer, but it contained no designation or description of what *particular* lots they would so donate.

The *terms* upon which the plaintiffs were to give these lots is a matter of dispute, and will be hereinafter referred to. On the 7th day of June, 1853, the three Overmans executed a deed for fifty lots, embracing, among others, the lot now in controversy, to the county. The Overmans and Brown were partners. This deed contained only this condition or reservation, viz., "that, in the event the county seat should, at any time, be removed from Cedar Falls, then the title to all of the aforesaid lots which shall, at the time of such removal, remain unsold by the county, shall revert back to us, with all improvements thereon," and was drawn by Dr. Brewer, one of the commissioners. The Overmans objected to its terms, on the ground that it did not fully express the conditions upon which the proposed donation was to be made. They nevertheless signed and acknowledged it, and left it in the hands of the notary who took the acknowledgment, for the purpose of having it executed and acknowledged by Brown, who was then absent. The deed, as prepared, contemplated an execution by Brown, as well as by the Overmans. When Brown returned, the notary presented him the deed for execution and he signed it, and then said he would examine it and see what he had signed before he delivered it. He immediately read it, and at once expressed his dissatisfaction with the condition above *quoted*, and refused to deliver it to the notary, and this deed has ever since been in the possession of plaintiffs.

Two days after the date of this deed, viz., June 9th, 1853, and before the return of Brown, the commissioners did locate the county seat at Cedar Falls, and it is clear that they supposed that the county would get the fifty lots. On the 7th day of November, 1853, the Overmans and Brown executed another deed for the same lots embraced in the first deed, and tendered the same to the county judge, who refused to receive the same, for the reason, as he claimed, that it contained conditions not in the proposal or in the first deed. This deed contained a condition "that the proceeds of the sales of the above lots shall be expended in the erection of public buildings at Cedar Falls for the use of said county, and that in the event of the removal of the county seat, at any time hereafter, from the said village of Cedar Falls, then the title to the lots shall revert back to the grantors, or the county shall pay to the grantors such a sum of money as shall be awarded to them as a fair compensation for said lots by legal arbitrators."

Afterward, January, 1854, two of the commissioners indorsed on the deed, thus offered to the county, a certificate that "it contained the real conditions, and only those, contemplated between the county and the grantors in the original agreement," and after this the deed was again offered to the county and refused.

In December, 1853, the county sold part of the lots at auction, against plaintiffs' objection. One or more of the plaintiffs at times said the county's title was good, but gave an explanation of this, arising out of the misrepresentations of the county judge.

On the 24th of March, 1854, one Pease purchased of the county the lot in dispute at *private sale*, and received a deed for the same. He afterward conveyed to the defendant Kerr. Both Pease and Kerr had notice of the dispute between the plaintiffs and the county in reference to the title of the fifty lots.

In January, 1855, the legislature passed an act authorizing a vote to be taken on the question of the removal of the county seat of Blackhawk county, and in the 4th section of the act (p. 43 of Session Laws of 1854, 1855) it is provided that "it shall be the duty of the county judge (provided said county seat be removed) to refund the purchase-money to such persons as have purchased lots in the town of Cedar Falls from said county, with interest thereon from the day of purchase, provided said purchasers shall quitclaim their respective title therein to the said county of Blackhawk." The vote was taken, and in July, 1855, the records were removed to Waterloo, and the county seat was established at that place.

Prior to the vote on the removal of the county seat, the county judge had sold all of the lots claimed by him for the county, without any reservation for a place on which to erect county buildings, either on said lots or elsewhere in the village of Cedar Falls, and no part of the money arising therefrom was expended in the erection of public buildings in said village, and no provision whatever had been made for that purpose. The defendant now seeks to compel the plaintiffs to deliver the deed drawn by Dr. Brewer in June, 1853, and to quiet the title of the lot in question in the defendant.

The plaintiffs had judgment in the court below, and the defendant appeals.

*B. W. Poor* for the plaintiffs.

*Bissell & Shiras* for the defendant.

DILLON, J. — I. The first question which presents itself for decision, is one of fact, viz.: Was the deed of the 7th of June, 1853, ever *delivered* to the commissioners or to the county? As to the plaintiff, Brown, it is perfectly clear it was never delivered. Defendant scarcely

1. DEED: delivery.

contends to the contrary; but with much more plausibility he does insist that the delivery was complete as to the three Overmans, and, if so, the instrument would convey at least an undivided *three-fourths* of each of the lots embraced in the deed, and among others, the lot in controversy. The weight of evidence is against the defendant on this point. We mention the following circumstances:

1st. The proposition was a *joint* one by Overmans and Brown, to convey a *full* title to the lots, and not an undivided three-fourths.

2d. The deed as prepared contemplated that *all* of the plaintiffs should execute and acknowledge it.

3d. There was no agreement or talk between plaintiffs and commissioners about receiving and accepting a deed, unless signed by all.

4th. The fair weight of evidence is to the effect, that the execution of the deed by the Overmans was with the express understanding that the notary should retain it to obtain Brown's signature, and was not authorized to deliver it to the commissioners or to the county, and that it was never so delivered, either by the Overmans or by the notary.

Without Brown's signature the instrument was immature—not complete—and it was intended by the plaintiffs to be delivered when it was made perfect, and not before. And, in general, an instrument will not be regarded as delivered when anything remains to be done by the parties by whom the delivery is to be made. *Parker* v. *Parker*, 1 Gray, 409.

II. The defendant next makes the point, that if the deed was defective it may yet be treated in equity as a valid contract to convey, and enforced accordingly. It is true that defective deeds are often thus enforceable. *Doniphan & Hughes* v. *Street, ante,* 317. But this principle has no application to this case. If the instrument was

not sufficiently delivered to be valid as a *deed*, it could not be treated as sufficiently delivered to operate as a completed contract. *Parker* v. *Parker, supra.*

III. The defendant next claims that he is entitled to all of the equitable rights of the county, his remote vendor, and that the county has such equities and rights as that it would be entitled to a specific execution of proposal or contract to donate or convey the lots to the county. In other words, if, on the 28th day of March, 1854 (the date of the sale of the lot by the county to Pease, the defendant's vendor), the county could have enforced specific performance against the plaintiffs, the defendant now can, although the vendee of but one of the lots, and although it be admitted that the county could not *now* have such relief.

The question here arises, what was this original agreement, that is, what were its terms and conditions? Were these set forth in the deed of June 7th, or in the second deed? And here in our opinion the defendant fails upon the *evidence* to show that the terms and conditions of the contract were in fact settled. From the evidence we think the real cause of all the trouble that has since arisen, with respect to these lots, has grown out of the fact that the plaintiffs and the commissioners never *definitely fixed and settled* upon the precise terms and conditions upon which the lots were to be donated and received. The plaintiffs were willing to give the lots if the county seat should be located there, and if some satisfactory provision should be made whereby the avails of the lots should be used in securing the erection of public buildings, and they should be indemnified for the value of the lots if the county seat should subsequently be removed. In other words, they were not willing and did not agree to give fifty lots absolutely, and run the chances of the proceeds

3. CONTRACT: assent.

Overman and Brown v. Kerr.

being applied to the erection of county buildings at Cedar Falls, and of the county seat itself being removed.

The commissioners were not willing to accept lots with restrictions which would greatly diminish the value of the donation to the county. No insuperable difficulty was however apprehended. Brewer, one of the commissioners, drew the first deed. The Overmans demurred to signing it, but finally consented. Brown was absent. On the supposition and expectation that Brown would sign it when he returned, and that it would all be right, it was left with the notary, and the commissioners announced and settled upon the location of the county seat at Cedar Falls, considered their commission at an end, left for their homes in another county, and no further settlement or agreement was ever made and concluded between the plaintiffs and them, or between the plaintiffs and the county. It is fundamental that to render a proposed contract binding, it must be *assented* to by both parties in the same sense, or in a fixed and determinate sense. The minds of the parties must meet, mingle and concur, though this need not be at the same instant. A mere voluntary compliance with its terms, where there is no agreement previously acceded to and completed, does not render it obligatory upon the other party. See, in illustration, *Hazard* v. *New England Insurance Company*, 1 Sumn., 218; *Johnson* v. *Fessler*, 7 Watts, 48; *Meynell* v. *Surtees*, 31 Eng. Law & Eq. Rep., 475; *Tucker* v. *Woods*, 12 Johns., 190; *Tuttle* v. *Love*, 7 Id., 470. It is just here that the defendant's case fails. Brown's consent or accession to the specific terms of the grant or donation, was not had; the commissioners left without procuring it, that being no essential part of their duties, and neither they or the county and the plaintiffs made any subsequent agreement on the subject.

It is not necessary to deny that the commissioners might, under the act, if they deemed it best for the county, make

**4. COMMIS-SIONERS: power to contract.** the location with reference to the proposed donation. But their whole powers and duties were expressed in the act which created them. Perhaps they might accept the grant for the county upon the conditions named in the first deed; as, under *Twiford* v. *Alamakee County*, 4 G. Greene, 60, these conditions were such only as the law would imply. But the act did not constitute them, in any sense, the agents of Blackhawk county, or empower them to bind it to the performance of any obligations whatever. They would possess no authority to make a contract with the proprietors, agreeing, on behalf of the county, to cause public buildings to be erected on certain lots, or to pay to them the value of the lots if the county seat should be removed.

The defendant argues that, by the tender of the *second* deed, the plaintiffs admit a contract as therein set forth. Admitting, for the argument, that an acceptance of this deed by the county judge would bind the county, it seems to us clear that the county, or the defendant, whose rights are derived from and dependent upon those of the county, cannot set up rights under an instrument which the county rejected because it did not contain the contract of the parties. Besides, this ground of relief is not set up by the defendant in the pleadings.

As we hold that there was no completed contract, it becomes unnecessary to determine the other point made by appellant's counsel, viz., that enough was shown to take the contract out of the statute of frauds.

The evidence, as respects the lot in controversy, which was sold at private sale to a party conversant with the dispute between the plaintiffs and the county, does not *estop* the plaintiffs from asserting their title: as to the other lots, it is needless to inquire.      Affirmed.

COLE, J., *dissenting.*—I do not concur in the conclusions of fact reached by the majority of the court, and, hence,

not in the judgment. In my view it should be reversed, at least as to three-fourths of the title. But as the difference between myself and the majority is one as to conclusions of fact purely, it would serve no useful purpose for me to review the evidence and show the reasons for my conclusions. I have no occasion to differ with the legal principles announced in the opinion.