IRELAND *v.* GERAGHTY and others. (Bill.)

GERAGHTY *v.* IRELAND and others. (Cross-bill.)

*(Circuit Court, N. D. Illinois.* January 8, 1883.)

1. TRUST—CREATION OF—SUBSEQUENT DESIGNATION.

If a conveyance is made to a trustee upon trusts thereafter to be declared or designated by the grantor, and the trustee accepts the designation so made, the trustee is bound by such declaration and designation as completely as if the deed and declaration of trust were simultaneous, and part of one and the same transaction.

2. CONVEYANCE TO INFANT—DELIVERY, WHEN INOPERATIVE.

Where a deed in fee-simple was made by parents to their child, who was but little more than four months old, conveying to such child certain town lots, which was never delivered to the grantee, and, considering the immature age of the grantee, it was perhaps impossible to have made such a delivery and unnecessary that it should be made, *held,* that the grantors in such deed should do some act manifesting an intention to deliver the deed and make it effective; and where such a deed was never recorded or published, or in any way, by either of the parents, or ever after, alluded to in such way as to show that they or either of them considered it a consummated transaction, the deed is an inoperative conveyance.

3. DEED OF TRUST—UNDUE INFLUENCE.

The allegation that a conveyance of real and personal property was obtained by undue influence of the grantee upon the mind of the grantor, must be established by evidence or it will not be considered.

4. SAME—CERTAINTY IN TERMS.

Where there is sufficient certainty in the terms of the declaration of a trust for charitable uses to enable a court of equity to take possession through its own trustee or receiver and execute the trust, and carry out the wishes and intentions of the donor, it is sufficient when made to an express trustee.

5. SAME—WHEN DEEMED EXECUTED.

Where a party made a deed of trust to a trustee of all his property, real and personal, and delivered to such trustee all his credits and securities, so indorsed and transferred to such trustee as to enable him, if he had chosen to do so, to exercise absolute control and ownership over them, the fact that the trustee returned them to the *cestui que trust,* who collected and reinvested and expended a portion of them in the exercise of his own judgment, and to some extent in accordance with the arrangements he had previously made, is not sufficient to show that the trust never became executed, notwithstanding the deed of trust was not recorded during the life of the *cestui que trust.*

In Equity.

*Hoyne, Horton & Hoyne* and *John J. Jewett,* for complainant.

*W. W. Farwell* and *Robert Hervey,* for defendant.

BLODGETT, J. The original bill in this case is filed by complainant to obtain a judicial construction of the trusts under which complainant claims to hold certain real and personal estate, conveyed to

him in his life-time by Michael R. Keegan, now deceased, and the cross-bill is filed by Peter Geraghty, who claims said property as the sole heir at law of Mary Gertrude Keegan, the only child of said Michael R. Keegan, and seeks to have the alleged trusts declared void and set aside, and the property in question awarded to the complainant in the cross-bill. The material facts in the case, as they appear from the record, are briefly these: Michael R. Keegan, who had been a resident of the city of Chicago for 10 or 12 years, died in said city on November 15, 1879, leaving no widow, and but one child, Mary Gertrude Keegan, and she died on the twenty-sixth of December, 1879, aged a little over four years, leaving as her next of kin and sole heir at law the complainant in the cross-bill, who is her maternal grandfather. In the month of August, 1874, Keegan married Bidelia M. Geraghty, the mother of the child Mary Gertrude, and the wife died in the latter days of July, 1879. For some time prior to his death Keegan had expressed the intention of leaving his property in the hands of the Rt. Rev. John Ireland, then and now coadjutor Catholic bishop of the diocese of Minnesota, in some form of trust for the benefit of this child, Mary Gertrude, and, in the event of her death, for some charity; and on or about the first day of January, 1879, he forwarded to Bishop Ireland a tin box containing all or nearly all the notes, bonds, and other securities for the payment of money which he, Keegan, then held; and on the fourth day of February, 1879, Keegan executed an unconditional deed in fee-simple to Bishop Ireland, conveying to him all the real estate he, Keegan, then owned. No consideration was paid by Bishop Ireland for this conveyance, and there is no doubt from the proof that this conveyance was made upon such trusts as Keegan should direct or create; that is, it was not a gift to the bishop individually, but a conveyance to him in trust for such purposes as the grantor in the deed should appoint.

At about the same time, perhaps simultaneously with the execution of this deed, but probably some months later, and on or about the eighteenth of April, 1879, Keegan executed and delivered to Bishop Ireland a written paper in the following words:

"*To the Right Reverend John Ireland, Coadjutor Bishop of St. Paul, Minnesota:*

"RIGHT REVEREND SIR—The real and personal property which I have heretofore and may hereafter convey to you are for the benefit of my infant child, Mary Gertrude Keegan, born November 15, A. D. 1875, to be delivered to her, with its accrued profits, rents, and interest, when she shall become of age. Should she die before coming of age, and leave no issue, then to your-

self, for the purpose of providing an agricultural home for poor boys, in connection with an industrial school.

" Witness my hand and seal this fourth day of February, A. D. 1879.
      [Signed]                         " MICHAEL KEEGAN.   [Seal.] "

And underneath this instrument is written an acceptance by Bishop Ireland, of the following tenor:

" I hereby accept the above trusts for the purposes above specified.
      [Signed                          " JOHN IRELAND."

Upon the back of this instrument is written the following letter from Keegan to Bishop Ireland:

"*Right Reverend John Ireland, D. D., Coadjutor Bishop of St. Paul, Minnesota:*

"RIGHT REVEREND SIR—To what is written on the other I add further that if my child should refuse to comply with your orders and wishes, and go from under your control, then while she so remains she is not to receive a dollar from you, either towards her support or education; but in case of her sickness do as your heart suggests. If she should become a religious, which God grant, before coming of age, place $10,000 at her disposal when fully professed, and the balance when she is 21 years old. Should she marry before becoming of age, she can have $5,000 on her marriage, to be placed at interest, and have the yearly interest of it until she is of age; the yearly interest or rent is to be put in staple coupon stocks, and as it falls due. But 10 per cent. of the interest or rent is to be regularly deducted from the income and devoted to such charities as your lordship thinks proper; but one-third of this 10 per cent. is to be given for masses for my soul, in union with the souls in purgatory, and the masses are to be said by priests in poor missions, or who need a little help. Regarding my wife, I will hereafter make a separate statement, which must be satisfactory to your approval. But if I should die suddenly, then let her have a decent support while she remains unmarried. These conditions are to apply to my property in your hands at the time and after my death.
      "I remain, my lord, most respectfully, your most obedient servant,
                              " MICHAEL R. KEEGAN."

The proof shows that the deed to Bishop Ireland, and the declaration of the trusts upon which the deed was made and the personal property delivered to him, were both prepared at the same time by the same attorney, and after consultation between Keegan and his attorney as to the best mode of creating the trust, so as to probably cause the least trouble to the bishop, and, if possible, to avoid litigation with any prospect of success; and whether the declaration or statement of the trusts was signed and delivered simultaneously with the deed, or at a subsequent date, in my estimation is of but little consequence. It may be, as I have already suggested, that the

statement of the trusts was not signed and delivered to the bishop until the bishop was in Chicago, some time in the month of April, and possibly the letter upon the back of the declaration of the trusts was written thereon at or before the time it was delivered to the bishop. This, however, seems to me to be of little consequence, as there can be no doubt of the proposition that if a conveyance is made to a trustee upon trusts thereafter to be declared or designated by the grantor, and the trustee accepts the designation of uses so made by the grantor, the trustee is bound by such declaration and designation as completely as if the deed and declaration of trust were simultaneous, and part of one and the same transaction. There can be no doubt of the fact that by the conveyance of the property in question to the bishop he became a trustee, and until the objects of the trust were designated he was a mere naked trustee; but as soon as the grantor had in writing indicated the uses to which the property was to be applied, and the trustee had accepted the terms of the trust so indicated, the transaction was complete; so that even if we assume or admit that the letter on the back of the declaration of trust was written there before the delivery of the instrument and the acceptance of the trusts, then the written declaration of trust, dated February 4th, must undoubtedly be considered as modified by the letter of April 18th; but the modifications so made are of no importance at this time, as they only related to the management of the estate during the life and minority of the child, and during the life of the wife after her husband's death and while she remained a widow. If this child or the widow of Keegan were yet alive, important questions might arise as to the support of the child during her minority, and the support of the widow; but the particulars in which the letter modifies the declaration of trust in no way affect the questions as to the disposition to be made of the estate in case of the death of the child without issue.

The child, Mary Gertrude Keegan, was born November 15, 1875, and on the seventh day of February, 1876, when the child was but little more than four months old, a deed in fee-simple was made by Keegan and his wife, conveying to this child two lots then owned by Keegan, described as No. 425 May street and 457 West Twelfth street, in this city, and being part of the property conveyed to Bishop Ireland by the deed of February 4, 1879. At the time this deed was executed and acknowledged Keegan remarked to the notary, pointing to the child, who was held in her mother's arms, "She is early in acquiring property," and he handed the deed towards the child, but did

not give it into her hands, but kept it himself. This deed was never recorded, and was found among Keegan's papers after his death.

The questions raised upon these leading facts are these:

(1) Geraghty, the cross-complainant, insists that the deed from Keegan and wife to the infant child, made in February, 1876, is an operative conveyance, and vested the fee-simple to the lands therein described in the child, and that he, as the sole heir at law of the child, is entitled to hold the property, and to have the conveyance from Keegan to Bishop Ireland set aside as a cloud upon his title to the property covered by the deed to the child. (2) That the conveyance of the real and personal property to Bishop Ireland was obtained by reason of the undue influence of Bishop Ireland upon the mind of Keegan. (3) That the object of the trust in Bishop Ireland is left so obscure, uncertain, and ill-defined as to render such trust void and inoperative, and make it impossible to uphold or execute it as a trust to a charitable use. (4) It is insisted that the trust was never so far completed as to make it a valid trust in Bishop Ireland for the purposes designated in the declaration of trust of February 4, 1879.

As to the deed from Keegan and wife to the child, the only question is whether it can be treated as ever having become an operative deed. It never was delivered to the grantee, and, considering the immature age of the grantee, it was, perhaps, impossible to have made such a delivery, and unnecessary that it should have been so made; but there is no doubt that the grantor in such a deed should do some act manifesting an intention to deliver the deed and make it effective. The testimony does not disclose the motives which led these parents, so soon after the birth of this child, to unite in a conveyance of this character. We only know from the proof that such a paper was signed and acknowledged by them. It was never recorded or published, in any way, by either of the parents, or ever after, alluded to in such way as to show that they, or either of them, considered it a consummated transaction. Whether the deed was made at the instance or request of the mother, and to please her, or whether it was a part of some inchoate plan or purpose of one or both of these parents, which was subsequently abandoned, we do not know. We do know this, however, that Keegan was a man of affairs, well acquainted with the forms of procedure requisite to make a valid conveyance of real estate; that he prepared most of his own deeds and business papers; and this fact, coupled with his retention of the deed without recording it, is quite conclusive evidence, to my mind, that he never intended it to become operative, especially when you supplement this fact with the manner in which he subsequently dealt with this property, and the disposition which he subsequently made of all his prop-

erty for the benefit of this child. I therefore feel impelled to the conclusion, from the testimony in this case, that the deed was never delivered, and has never become an operative grant to this child; and therefore that no title to the lands mentioned in this deed was cast upon the cross-complainant, Peter Geraghty, by descent as the sole heir at law of the child.

As to the allegation of undue influence, I can find no evidence in the record that Bishop Ireland ever exerted, or attempted to exert, any influence to induce Mr. Keegan to convey his property to him, or make him a trustee. On the contrary, whatever evidence there is bearing on that question tends to show that Bishop Ireland accepted this trust reluctantly, and only out of consideration for his long friendship towards Mr. Keegan, and at Mr. Keegan's earnest and pressing instance and request. That Keegan was an earnest and zealous Catholic, and that his relations to Bishop Ireland for many years had been especially friendly and confidential, are facts amply shown from the proofs in the case. But it nowhere appears that the bishop advised this disposition of Keegan's property, or sought the office of trustee.

As to the objection to the validity of the trust upon the ground that it is not so sufficiently defined that it can be executed with certainty, it seems to me very clear that Keegan's first and leading purpose was to make provision for his child. He had, by his industry and close economy, accumulated quite an estate for a man in his position of life, valued, as he deemed it, about the time this transaction took place, at from $75,000 to $80,000. He had unfortunate differences with his wife. He felt that his health was rapidly declining, and was anxious to make some sure disposition of the property by which it could be preserved for the benefit of his child; this seems to have been his first and controlling thought. Running throughout the whole web of this record is the constant expression of his anxiety to secure his property for the benefit of this child. At times, he seems to have made some provision for his wife; but the papers making such provision were destroyed, and whatever arrangement of that kind was contemplated was never completed, so that finally, when, after consultation with his attorney, he came to a definite conclusion, it was to convey all his real and personal property to the bishop, in trust for the child; and the document which, undoubtedly, was intended to define that trust clearly, as the guide for the trustee in the subsequent disposition of the estate, was the paper prepared simultaneously with the deed by the attorney, and dated February 4, 1879. The subsequent letter of April 18th, indorsed upon the back of this

paper, may be taken, in some respects, to be a letter of more minute direction as to the manner in which the bishop was to execute the trust for the benefit of the child, and, in a certain contingency, for his wife. He goes more into the details of how he would have the trust executed. What should be done with the estate in the event of the death of the child was a matter which he seems to have fully settled from the time the declaration of trust was signed, and is nowhere changed, nor is any intent to change it manifested. What he directed was that, in the event of the death of the child leaving no issue, the property was to be held by Bishop Ireland "for the purpose of providing an agricultural home for poor boys, in connection with an industrial school." This seems to me as definite as most donors, contemplating the founding of a charity, would consider necessary, and as definite and explicit as is necessary to point out the charitable use to which the property is to be applied by the trustee. It seems to me that a fair test as to whether this trust is stated with sufficient certainty or not is to inquire whether, if Bishop Ireland should neglect or refuse to execute this trust in accordance with the directions of the grantor, there is sufficient certainty in the terms of the declaration of trust to enable a court of equity to take possession of the trust through its own trustee, or receiver, and execute the trust and carry out the wishes and intentions of the donor. The direction is to provide an agricultural home for poor boys. It seems to me that such a direction would be clearly understood by any court of equity having jurisdiction of such matters; that such court could, without difficulty, see to it that the trustee which it should appoint should carry out the purpose thus clearly manifested. I am, therefore, of opinion that this trust cannot be defeated by reason of any uncertainty as to its object, or the purposes of the donor.

But it is urged that this trust never became fully created, because the deed to Bishop Ireland was not recorded during Keegan's life, and very shortly after the securities were forwarded to the bishop, he returned a portion of them to Keegan, who collected and reinvested and expended a portion of them in the exercise of his own judgment, and to some extent in accordance with the arrangements he had previously made; and that, shortly after the death of Mrs. Keegan, Bishop Ireland returned to Keegan, at his request, at Chicago, the box of securities, and that Keegan retained possession of those securities from that time until his death, thereby depriving the transaction of the character of a donation *inter vivos,* or a completed gift during the life

of the donor. The proof shows that at the time these securities were sent to Bishop Ireland, they were all so indorsed and transferred as to enable him, if he had chosen to do so, to exercise absolute control and ownership over them. Some of the securities, however, as the proof shows, were in such a condition that they needed constant attention. Bishop Ireland had reluctantly accepted the sole trust and care of these securities, and undoubtedly expected that during the life of Keegan he would have the benefit of Keegan's experience and ability in caring for, reinvesting, and otherwise looking after the property. It is hardly to be supposed, from what the testimony discloses in regard to this matter, that Keegan, with his habits and his methods of business, expected or intended to lose all interest in the property the moment he had made such change as to vest the legal title in Bishop Ireland, his trustee. His affection for his child, which seems to have continued warm and active to the last, would alone have prompted him to take a continued interest in the management of his estate. It is, therefore, only natural, it seems to me, that he should have continued to exercise such supervision over and interest in the property as he thought would best secure its preservation and further accumulation.

The proof discloses the fact, that for some real or imaginary reason, Keegan, in the latter part of the year 1878, or forepart of the year 1879, was fearful that his wife and some of her friends would take measures to deprive him of the control of his property, —to bring a charge of insanity, or incompetency to manage his property, before some of the courts in Chicago, so as to secure the appointment of a conservator, or put his property in the hands of some other person to manage. He therefore, somewhat hurriedly, in view of such a contingency, sent the personal estate to the bishop at St. Paul, perhaps earlier than he intended; but when any of the papers were returned to him he assumed always to be acting, in whatever he did about it, in the interest and as the agent of Bishop Ireland; stated frankly to his acquaintances the property belonged to Bishop Ireland, and did not claim to be the absolute owner of it. It is also true that Bishop Ireland sometimes, in his communications to Keegan in reference to investments to be made from the estate, treated Keegan as having some control or management of the property, or as being entitled to be consulted, or to have the management of it; but this does not militate against the relation of trust which the bishop had assumed, nor, it seems to me, can it be held to defeat the bishop's title.

Much stress is laid upon the fact, as disclosed in the testimony of Mr. Comisky, one of the witnesses, that the morning after the death of his wife, Keegan informed him of the fact of Mrs. Keegan's death, and in the same connection said he was going now to send to the bishop for his box; but in the light of the relations which had existed for some months previously between Keegan and his wife, and the fears which he had expressed of her initiating steps to deprive him of the control of his estate, it is very likely that he did not dare to ask that the securities be returned to him, even that he might perform some necessary work in regard to them, while his wife was living, for fear of such proceedings, and that as soon as she was dead he felt relieved in that regard, and at liberty to do, in reference to the property, whatever he felt, as a business man, was necessary to be done in order to properly conserve and care for it. Undoubtedly the almost positive refusal and objections of Bishop Ireland to take upon himself the responsibility of this trust, had the effect to induce Keegan to either expressly or impliedly promise that the bishop should be relieved of all trouble in regard to the estate so long as he, Keegan, was able to attend to it. This is natural and probable. It is not likely, from the proof, that Keegan felt any special sorrow or grief over the death of his wife, and such was the organization of the man's mind that he perhaps felt a sense of relief when he knew that she could no longer annoy him, or interfere with his plans. These arrangements in regard to the property for the primary benefit of his child, and the provision as to its future disposition in case of the death of the child, would and could no longer be thwarted and embarrassed by the interposition of his wife, and he therefore felt free to aid the bishop by such attention as he could give the property. The proof is ample throughout the record that after the securities were returned to Keegan he industriously, and, as far as his health would permit, continuously applied himself to the arrangement and attention which the business connected with the securities demanded, but in all his dealings he constantly stated that what he was doing was for the bishop, and more fully to consummate the arrangement he had made for giving the bishop complete control of his estate. In April, 1879, he told John Adams, an intelligent business man in this city, that he had "fixed everything relating to his affairs; that he had left everything to his child, and in case of her death the whole property was to go to Bishop Ireland, to build an institution for destitute boys in the diocese of Minnesota. * * *" The term he used was "agricultural college for destitute boys." So, too, just be-

fore he was stricken down with his last illness, he told his house-keeper that, in the event of his sudden death, the tin box containing the securities was to be sent to Bishop Ireland, and during his illness his frequently-expressed wish and direction was that the securities should be placed at once in the hands of Bishop Ireland. At this time he had no fear of family complications. His wife was dead, no relative of hers, no relative of his own, no person, was seeking to control or interfere with the control of this property, so as to make him anxious to evade any judicial or other proceedings, because none were threatened or impending.

It seems, therefore, very clear to me from the proof that whatever was done by Keegan, after the delivery of the securities to Bishop Ireland, was done in consummation and furtherance of the trust which he had created, instead of being intended to operate against or defeat it; and that nothing was done indicating an intention on the part of the donor or his trustee to cancel or abandon the trust. The child was living when Keegan died, and I have no doubt he remained entirely satisfied with the disposition he had made of his estate.

The will he made during his nearly-last rational moments does not, to my mind, seem intended to cancel or set aside this trust. The main purpose of the will appears to me to have been to appoint the bishop the guardian of the child. Making her his sole devisee would only operate to vest in her any property he owned which he had not conveyed to the bishop, but it could not divest the bishop of any title he had already obtained, and in regard to which the trust had been declared in writing.

I therefore come to the conclusion that the estate in the hands and control of the administrator, appointed by the probate court of Cook county, should be delivered to Bishop Ireland; that the cross-bill of Peter Geraghty should be dismissed for want of equity; and that Bishop Ireland should be left, so far as this court is concerned, to execute the trusts created by the conveyance and directions to him of the donor. As it is manifest from the entire tenor of the transaction that it was intended that Bishop Ireland should expend these trust funds in the diocese of Minnesota, it may hereafter devolve upon the courts of that state to see to it that this trust is faithfully administered according to the terms upon which the trust was created and accepted.

There can be no doubt of the proposition that a delivery of a deed is as necessary to the passing of the estate as the signing, and that so long as the grantor retains the legal control of the instrument, the title cannot pass any more than if he had not signed the deed. Shep. Touch. 57; 3 Washb. Real Prop. *577; *Cook* v. *Brown*, 34 N. H. 460, 476; *Johnson* v. *Farley*, 45 N. H. 505; *Overman* v. *Kerr*, 17 Iowa, 490; *Fisher* v. *Hall*, 41 N. Y. 421; *Duer* v. *James*, 42 Md. 492; *Younge* v. *Guilbeau*, 3 Wall. 641. Thus, where a deed was placed in the hands of a depositary, to be delivered to the grantee upon the death of the grantor, provided it was not previously recalled, but the grantor reserved the right and power to recall it at any time, this was held not to be a good delivery. *Cook* v. *Brown, supra; Stinson* v. *Anderson*, 96 Ill. 373: *Prestman* v. *Baker*, 30 Wis. 644; *Baker* v. *Haskell*, 47 N. H. 479; *Brown* v. *Brown*, 66 Me. 316.

To constitute delivery of a deed the grantor must, as a rule, part with the possession of it, or, at least, with the right to retain possession. *Younge* v. *Guilbeau, supra; Johnson* v. *Farley, supra.* Even the registry of the deed by the grantor, though entitled to great consideration upon this point, and sufficient, perhaps, in the absence of opposing evidence, to justify a presumption of delivery, is not conclusive, and the presumption may be repelled by the attendant and subsequent circumstances. *Younge* v. *Guilbeau, supra; Mitchell* v. *Ryan*, 3 Ohio St. 377. See, also, *Masterton* v. *Cheek*, 23 Ill. 72.

Although, as a rule, the grantor parts with the possession of the deed, a formal delivery to the grantee in person is not necessary. A delivery may be by acts without words, or by words without acts, or by both. Anything which clearly manifests the intention of the grantor, and the person to whom it is delivered, that the deed shall presently become operative and effectual; that the grantor loses all control over it; and that by it the grantee is to become possessed of the estate,—constitutes a sufficient delivery. The very essence of the delivery is the intention of the party, (*Bryan* v. *Wash*, 2 Gilm. 557, 565; *Walker* v. *Walker*, 42 Ill. 311; *Masterton* v. *Cheek*, 23 Ill. 72; *Duer* v. *James*, 42 Md. 492; *Ruckman* v. *Ruckman*, 32 N. J. Eq. 259; *Nichol* v. *Davidson Co.* 3 Tenn. Ch. 547; *Thatcher* v. *St. Andrew's Church*, 37 Mich. 264; *Gregory* v. *Walker*, 38 Ala. 26; *Dearmond* v. *Dearmond*, 10 Ind. 191; *Somers* v. *Pumphrey*, 24 Ind. 231, *Burkolder* v. *Casad*, 47 Ind. 418; *Rogers* v. *Cary*, 47 Mo. 235; Shep. Touch. 57, 58;) and the intent of either or both the parties may be implied from subsequent admissions, conduct, or circumstances; *Nichol* v. *Davidson Co., supra.* Where the circumstances show, unmistakably, that one party intended to divest himself of title, and to invest the other with it, delivery will be complete, though the instrument still remains in the hands of the grantor. *Ruckman* v. *Ruckman, supra.* Thus, where a father voluntarily made a deed to his son and did not deliver it, but their subsequent conduct was such as to show that both of them considered the deed as having been effectually executed for the purpose of passing title, it was held that no actual delivery was necessary *Walker* v. *Walker, supra.*

The law presumes much more in favor of the delivery of deeds in cases of voluntary settlements, especially when made to infants, than it does in ordinary cases of bargain and sale. The same degree of formality is never required, on account of the great degree of confidence which the parties are presumed

to have in each other, and the inability of the grantee, frequently, to take care of his own interests. The presumption of law is, in such cases, said to be in favor of the delivery, and the burden of proof is on the grantor to show clearly that there was none. *Bryan* v. *Wash, supra.* See, also, *Walker* v. *Walker, supra.* It is a general rule that acceptance by the grantee is necessary to constitute a good delivery. But where a grant is plainly beneficial to the grantee, his acceptance of it will, it is said, be presumed, in the absence of proof to the contrary. *Mitchell* v. *Ryan,* 3 Ohio St. 377; *Rogers* v. *Cary,* 47 Mo. 235; *Dikes* v. *Miller,* 24 Tex. 417; *Dale* v. *Lincoln,* 62 Ill. 22. See, however, *Com.* v. *Jackson,* 10 Bush, 424. An infant of any age can be the grantee of land. *Masterton* v. *Cheek,* 23 Ill. 72; *Rivard* v. *Walker,* 39 Ill. 413. And, in such case, an actual delivery being useless and an acceptance impossible in many cases, the intention of the grantor is the controlling element, the acceptance of the grantee of a beneficial conveyance being presumed: *Masterton* v. *Cheek, supra; Rivard* v. *Walker,* 39 Ill. 413; *Cecil* v. *Beaver,* 28 Iowa, 241; *Spencer* v. *Carr,* 45 N. Y. 410. In such case it is said that a greater presumption of acceptance is indulged in their behalf than as to adults from the fact of their incapacity to manifest directly their acceptance of the deed. *Rivard* v. *Walker,* 39 Ill. 413.

An attentive consideration of the above cases will, it is believed, lead the reader to the conclusion that the decision of the learned judge, in the principal case upon the point in question, is entirely correct. Actual delivery being useless, and the conveyance clearly beneficial to the infant, in the absence of evidence showing a contrary intention on the part of the grantor the court would have been warranted in finding that the title passed by the deed. But the circumstances, as it seems to the writer, show that such was not the intention of the grantor, which, according to the authorities above cited, constitutes the controlling element in the case. Indeed, the retention of control of the deed, and his subsequent dealings with the same property, seem clearly inconsistent with an intention on his part that the conveyance in question should operate to pass the title. Upon the whole, the whole case seems well decided.                    MARSHALL D. EWELL.

*Chicago, February* 15, 1883.