| 93 | 569 |
| 97 | 21 |

| 93 | 569 |
| 107 | 77 |

| 93 | 569 |
| 109 | 600 |

## Staunton.

### THE VIRGINIA HOT SPRINGS CO. AND OTHERS V. HARRISON.

#### SEPTEMBER 24, 1896.

1. CONTRACTS—*Correspondence—Acceptance of Proposal.*—In order to establish a contract by correspondence there must appear upon the face of the correspondence a clear accession on both sides to one and the same set of terms. A proposal to accept, or an acceptance, on terms varying from the offer, is a rejection of the offer. The acceptance must be unqualified, and no point left open for future consideration or negotiation between the parties.

Appeal from a decree of the Circuit Court of Bath county, pronounced April 27, 1896, in a suit in chancery wherein the appellee was the complainant, and the appellants were the defendants.

*Reversed.*

The opinion states the case.

*R. L. Parrish* and *Wm. M. & J. T. McAllister*, for the appellants.

*John W. Stephenson*, for the appellee.

KEITH, P., delivered the opinion of the court.

R. J. Harrison filed his bill in the Circuit Court of Bath county praying for the specific performance of a contract for the purchase of a lot from the Hot Springs Company, making the company, H. T. Wickham, and Henry Taylor, Jr., trustees, parties defendant. The Hot Springs Company an-

swered the bill, and from the pleadings and proofs the case appears to be as follows:

The Virginia Hot Springs Company is the equitable owner of the Hot Springs property situated in Bath county, Va., which it has greatly improved as a health and pleasure resort. The legal title thereto is in H. T. Wickham and Henry Taylor, Jr., as trustees. The property has in part been divided into lots which have been offered for sale. In the autumn of 1894, R. J. Harrison, desiring to purchase one of these lots, commenced negotiations to that end with Decatur Axtell, the President of the Hot Springs Company, and on November 22 of that year, Axtell wrote to Harrison a letter, filed as Exhibit "A" with the bill, which is as follows:

"Richmond, Va., November 22, 1894.

"Mr. R. J. Harrison, Hot Springs, Va.

"Dear Sir: Mr. Ingalls says he will give the $72 rent if you will have the office built of pressed brick. He says it ought to be light colored and very handsome. If you will make it of light colored brick and very handsome I will undertake to get one-half rates, and you can depend on it, although I have not yet seen Mr. Ingalls about it.

"Mr. Ingalls also says that we can sell you the lot you describe to me for $1,500, you to put up a brick store of two stories or more, and run it as a general store, including the drug business, as you please. You mentioned the other day about restrictions. We want to give you as few of them as possible. But you better read over our printed deed and see if it is objectionable. I do not think it can be. We will have to add to it that you shall not put up any fences, outside privies, nor unsightly structures, and shall connect with the sewer system. I don't know of anything else. These restrictions are, of course, in the interest of lot purchasers as much as the company.

"I also mentioned to Mr. Ingalls your desire of being con-

nected with the purchases of the company, but told him that
you did [not] make this a condition.   He has not replied
about this, but, as I told you, I am satisfied that it is a mat-
ter that may well receive our attention.   I am sure he won't
make it a condition in selling of the lot, nor would I want
to recommend it in that shape.

"I believe we have now a pretty definite understanding and
hope you will go ahead.   I am very sure the business will
be one that will give you the occupation you need, and first-
rate returns.

" Yours respectfully,

" DECATUR AXTELL,  Prest."

There seems to have been some verbal communication
between the President of the Hot Springs Company and
Harrison relative to these negotiations, but no writings
passed between them, after the letter just copied, until Feb.
22, 1895, when Decatur Axtell wrote to Harrison as follows:

" RICHMOND, VA., February 22, 1895.
"R. J. Harrison, Esq., Hot Springs, Va.

" Dear Sir: Mr. Ingalls and Mr. Osborn called my at-
tention to my letter to Mr. Ingalls, of November 17, 1894,
about your lot, in which I say:

" 'Mr. Harrison offers $1,500 cash for a lot 125 feet front,
about 60 feet deep, across the road leading to the stable
from McClintic's and Pole's lots, coming up in the angle
far enough so that there will be no one above him.   He
will undertake to put up a large (two or more stories, brick)
general store at once.   I told him I would recommend this,
and I have no hesitation in doing so.   It is an opportunity
which we ought not to forego.   He says he means business.'

" I got an immediate reply from Mr. Ingalls by wire, say-
ing, ' I am willing to let Harrison have the lot.'

" My attention is called to the difference in size of the

lot, and that, while it was assented to at the time, it was done, realizing that we were perhaps subjecting ourselves to some criticism on account of the prices which we asked McClintic and Dr. Pole for lots which bear no comparison whatever to this in size. Mr. Ingalls' and Mr. Osborn's ideas about this are certainly very forcible, and respond to opinions which I have already advanced to you.

"I shall see you tomorrow, and hope you shall be able to confine your lot to the original dimensions which I presented to Mr. Ingalls last November. It seems to me it should be ample enough; for, if you really need more room, I will consider the terms for the same with you.

"Yours respectfully,

"DECATUR AXTELL, President."

No written reply to this letter appears in the record, but on March 6, 1895, Harrison wrote as follows, to Axtell:

"HOT SPRINGS, BATH COUNTY, VA., March 6, 1895.

"Decatur Axtell, Esq.,

"Dear Sir: Referring to our conversation in regard to that lot opposite McClintic's store and Dr. Pole's cottage, (office) upon which I desire to erect a store building, I am willing to give $1,500 cash for it, if 140 feet fronting on the line of present roadway and running back at right angles to meet that 20-foot roadway, alongside of the Hot Springs run, (or creek) and that triangle at east end of lot to be left open, and ten-foot common, (or joint) alleyway alongside west end of the lot. Please give me an immediate answer.

"Yours, respectfully,

"R. J. HARRISON."

On March 8, 1895, Axtell, in reply to Harrison's letter of the 6th, wrote as follows:

"RICHMOND, VA., March 8th, 1895.

"Mr. R. J. Harrison, Hot Springs, Va.

"Dear Sir: My advices from Cincinnati are that if you want the lot as originally agreed upon, 125 feet frontage, for $1,500, it is all right.

"If this is satisfactory we will take up the other points, and see if they can be agreed upon. If it is not satisfactory, we will, of course, consider that nothing has been said, and that it is all ended.

"Yours, respectfully,

"DECATUR AXTELL, Prest."

On March 11th, 1895, Harrison replied as follows to Axtell's communication of March 8th:

"HOT SPRINGS, VA., March 11, 1895.

"Decatur Axtell, President V. H. S. Co.

"Your letter of March 8th, '95, duly received. I accept the lot at Hot Springs, Virginia, fronting one hundred and twenty-five (125) feet on the line of the main avenue, and running back at right angles to within twenty (20) feet of the edge of the Hot Spring branch, on the terms and conditions mentioned in your letter to me Nov. 22nd, '94. Please prepare deed and send to me at once.

"Very respectfully, &c.,

"R. J. HARRISON."

When the case came on to be heard the Circuit Court was of opinion that a contract upon the part of the Hot Springs Company for the sale of a lot to Harrison had been proven by the evidence, under circumstances that entitled the plaintiff to its specific execution, and entered a decree to that effect, from which the Hot Springs Company appealed.

A great many questions were discussed in the argument of this case, which, in the view we have taken of it, need not be considered.

The vital issue to be determined at the very threshold of the investigation is whether or not the plaintiff and defendant have entered into the contract that is set out in the bill of complaint.

In the letter of November 22, 1894, the President of the Hot Springs Company offers to sell the lot about which verbal negotiations had taken place between himself and the plaintiff, for $1,500, upon which a brick store of two stories or more was to be erected, in which a general store and drug business was to be conducted. From that letter it appears that in their conversations certain restrictions which the Hot Springs Company thought proper to impose had been discussed, and Harrison is advised to read over the forms of printed deeds in use by the Hot Springs Company. He was told in addition that he would be forbidden to erect fences, unsightly structures, and other objectionable buildings, and that he would be required to connect with the sewer system. In the letter from Axtell of February 22nd, he refers to a communication received by him from Mr. Ingalls and Mr. Osborn, directors in the Hot Springs Company. From this letter it appears that Axtell had, on the 17th of November, 1894, notified Mr. Ingalls that Harrison had offered $1,500 in cash for a lot of 125 feet front, and about sixty feet deep, and that Ingalls had by wire signified his acceptance of that offer. Axtell then goes on to say that his attention had been called to the difference in the size of the lot, evidently meaning that the lot described in his letter to Ingalls was larger than had been mentioned theretofore, and continues, " I shall see you tomorrow, and I hope you shall be able to confine your lot to the original dimensions which I presented to Mr. Ingalls last November. It seems to me that it should be ample enough; for, if you really need more room, I will consider the terms with you." Not only is there no evidence in the record that up to this time the offer of November 22nd had been accepted, but this letter of February 22nd is proof to

the contrary. The letter of March 6th from Harrison to Axtell seem to have been written in reply to that from Axtell to him of February 22nd, and offers $1,500 in cash for a lot with a frontage of 140 feet, and on certain conditions which need not be specified. This letter was not only not an acceptance of any offer theretofore made by the Hot Springs Company, but, inasmuch as it introduced a new term, is to be considered as a rejection of the proposition theretofore made. The letter of March 8, 1895, from Axtell renews the offer of the lot with a frontage of 125 feet, for $1,500, which is, of course, a rejection of the proffer of $1,-500 for a lot of 140 feet frontage. He then goes on to say: " If this is satisfactory we will take up the other points, and see if they can be agreed upon. If it is not satisfactory, we will, of course, consider that nothing has been said, and that it is all ended—" which is equivalent to saying that, " We. will sell you a lot of 125 feet frontage for $1,500, provided we can agree upon other points which must be considered between us, and, if we cannot reach a satisfactory conclusion upon those subjects which are to be discussed, we will consider that all is ended." Harrison replies to this: " Your letter of March 8, '95, duly received. I accept the lot at Hot Springs fronting 125 feet on the line of the main avenue and running back at right angles to within twenty (20) feet of the edge of the Hot Springs branch on the terms and conditions in your letter to me of November 22, ' 94. Please prepare deed and send to me at once." A deed was prepared and sent to Harrison which contained the " other points," which, by the letter of March 8th, were to be the subject of negotiation between the parties, if the offer of the lot with the dimensions and at the price stated in that letter was accepted; but, when Harrison came to inspect the deed thus tendered, he found that it contained restrictions and conditions, which, in his judgment, so far diminished the value of the property

that he declined to accept it. He then determined to rely upon his contract, and to seek redress in the courts.

In 1 Chitty on Contracts (11 Amer. Ed.), it is said at page 15: " Where an agreement is sought to be established by means of letters, such letters will not constitute an agreement unless the answer be a simple acceptance of the proposal without the introduction of any new term." And again: " If the original offer leave anything to be settled by future arrangement, it is merely a proposal to enter into an agreement. *   *   *   *   *   *   *   *   * The agreement is not complete until there is upon the face of the correspondence a clear accession on both sides to one and the same set of terms."

In 1 Parsons on Contracts, (6th Ed.,) p. 476, it is said: "The assent must comprehend the whole of the proposition; it must be exactly equal to its extent and provisions, and it must not qualify them by any new matter."

To the same effect are the decided cases. In the *Edichal Bullion Co.* v. *Columbia Gold Mining Co.*, 87 Va. at page 651, it is said: " A proposal to accept, or an acceptance, on terms varying from those offered, is a rejection of the offer, and a subsequent acceptance upon the terms offered does not make a contract."

In *Minneapolis, &c. Rwy. Co.* v. *Columbia Rolling Mill,* 119 U. S. 149, it is said: " As no contract is complete without the mutual assent of the parties, an offer to sell imposes no obligation until it is accepted according to its terms. So long as the offer has been neither accepted nor rejected, the negotiation remains open, and imposes no obligation upon either party. The one may decline to accept, or the other may withdraw his offer; and either rejection or withdrawal leaves the matter as if no offer had ever been made. A proposal to accept, or an acceptance, upon terms varying from those offered, is a rejection of the offer, and puts an end to the negotiation, unless the party who made the orig-

inal offer renews it, or assents to the modification suggested. The other party, having once rejected the offer, cannot afterwards revive it by tendering an acceptance of it."

Applying the principles thus enunciated, and which are too well settled to require any extended citation of authority, it appears that the letter from Harrison dated March 6, 1895, was a rejection of all offers previously made, and terminated the negotiation. The letter from Axtell of March 8th was a renewal of those negotiations, but not in a form which admitted of an unqualified acceptance, because, while the dimensions of the lot are stated and the price which the company was ready to take for it is fixed, it declares that before a contract could be consummated other points were to be considered. All points thus reserved for future negotiation between the parties were presented in the deed which the company tendered, and which Harrison rejected. It is evident, therefore, that the appellant, through its President, and R. J. Harrison never agreed upon all the terms and conditions of a contract. There was never a time upon the face of the correspondence " when there was a clear accession on both sides to one and the same set of terms."

It follows, therefore, that the contract as set out in the bill has not been established by the proof, and that the Circuit Court erred in decreeing its specific performance, and its decree must, therefore, be reversed.

*Reversed.*