### JOHNSTON v. FAIRMONT MILLS et al.

(Circuit Court, D. South Carolina. August 2, 1902.)

1. SALES—CONTRACT—CONFIRMATION.

Where plaintiff offered, through a broker, to sell to defendant certain cotton on specified terms, and defendant, in a letter to the broker, accepted the offer, "subject to" plaintiff's "confirmation," and it was the custom, in making purchases through a broker, to require confirmation of the principal, the contract was not complete until so confirmed, and, when canceled by defendant before it was so confirmed, no action could be maintained thereon.

2. SAME—WAIVER OF CONFIRMATION—CALLING FOR SECURITY.

Where plaintiff's offer, through a broker, to sell to defendant certain cotton, was accepted subject to plaintiff's confirmation, and before confirmation there were rumors of plaintiff's insolvency, whereupon defendant insisted that plaintiff should give security, such insistence was not a waiver of the requirement that he confirm the contract.

At Law.

C. P. Sanders and Simpson & Bomar, for plaintiff.
Nicholls & Jones, for defendants.

SIMONTON, Circuit Judge. This is an action at law, brought by A. S. Johnston, a citizen and resident of the state of Mississippi, against the Fairmont Mills, a corporation of the state of South Carolina. The Fairmont Mills is in the hands of L. Guy Harris, duly ap-

pointed its receiver; and the receiver, a citizen and resident of the state of South Carolina, is also made a party defendant. The cause has been submitted to the court to be tried without a jury. The complaint alleges the existence of contracts entered into between plaintiff and defendant on or about the 10th and 15th days of October, 1900, under which plaintiff contracted to sell and deliver to the Fairmont Mills 500 bales of cotton, 100 of said bales to be delivered during each of the months of February, March, April, May, and June, 1901, to be paid for as follows: For the cotton delivered during the months of February, March, and April, 1901, at the rate of 10⅜ cents per pound, for the rest of the cotton at the rate of 10⅛ cents per pound. That thereafter the price of cotton declined rapidly, and on or about the 27th October, 1900, the Fairmont Mills notified plaintiff that it had canceled the contracts, and would not accept, receive, or pay for the same. That plaintiff has always been ready to carry out his part of the contract, and has only been prevented from so doing by this action on the part of the defendant. That, owing to the decline in the price of cotton, plaintiff has been prevented from placing the cotton at the prices agreed upon, and that he has been damaged by this action on the part of the defendant in the sum of $4,687.50, and the complaint prays judgment therefor. The defense amounts to a general denial of the existence of any such contracts.

These are the facts as developed in the testimony: The transaction occurred through the agency of C. P. Matthews. Mr. Matthews is a cotton broker, residing in Spartanburg, S. C., doing business in the Carolinas, chiefly with cotton mills. On 10th October, 1900, Mr. Harris, president of the Fairmont Mills, made an offer to him, as such broker, to buy cotton, 100 bales for each of the months of February, March, and April, at 10⅜ cents. He communicated the offer by telegram to the plaintiff at Meridian, Miss., and received by telegram the same day authority to accept the offer of 300 bales at 10⅜, shipments named. He communicated by telephone to Mr. Harris the receipt of this authority, and on the next day (11th October) wrote to Mr. Harris, as follows:

"I beg to confirm sale to you of 300 B/C, to you at 10⅜, landed Moores, So. Ca., for a/c of A. S. Johnston, Meridian, Mississippi. The cotton to be half each St. and good Mid., to be shipped 100 B/C each in February, March, and April, wts. guarantied within three pounds. Please confirm sale and oblige."

"Yours truly,                                                            C. P. Matthews."

It does not appear, except by this letter, that Mr. Harris knew who would furnish the cotton. On receipt of this letter Mr. Harris replies:

"I have your letter of this date (11th Oct.) confirming sale to us of 300 B/C, landed at Moores, So. Ca. The cotton to be half each St. and good Mid., and 100 bales delivered each month of February, March, and April next, wts. guarantied within three pounds; and hereby accept offer of same, subject to A. S. Johnston's confirmation.

"Yours truly,                                                       W. J. Harris, Presdt."

On 15th October, 1900, Mr. Harris made another offer to C. P. Matthews for the purchase of 200 bales of cotton at 10⅛, deliverable 100 bales each in months of May and June, 1901. This was communicated also to A. S. Johnston at Meridian, Miss., by wire, and Johnston,

by wire, answered, "Confirm sale 100 bales each May and June, St. Mid. to good Mid., 10⅛." On its receipt Matthews notified Harris, and on the next day he wrote a letter, identical in terms, except as to number of bales and the price, with his former letter. To this Harris replies, using the same terms as his reply to the former letter, varying only as to the number of bales and the price, and ending, as in his former letter, "Sold to us by A. S. Johnston, Meridian, Miss., and subject to his confirmation." The usage of the mills is always to require confirmation by the principal of contracts made through the broker, and this confirmation is made to the purchaser direct; sent either by mail or through the broker. In the present instance Matthews requested Johnston to confirm direct to Harris. After the 15th, and between that day and the 25th, October, unpleasant rumors were in circulation as to the solvency of Johnston, whereupon Mr. Harris, on 25th October, demanded from Matthews security for the performance of these contracts by Johnston. Matthews wired this demand to Johnston, who replied, referring to C. W. Robinson and John Kenyon. Matthews telegraphed to these gentlemen to confirm this, but got no reply. On 27th October, Matthews not furnishing the security demanded, Harris canceled the contracts. On 29th October, 1900, Matthews inclosed to Harris letter of Johnston confirming the contract of 10th October, except that the place of delivery was stated to be Spartanburg, S. C., instead of Moores, as stated by Matthews. On or about 1st November, 1900, Johnston went to Spartanburg, and in company with Messrs. Boziman, his attorney, and Mr. Cairn, of Mississippi, offered Mr. Cairn as his surety for delivery of the cotton as per contracts. Mr. Harris made no objection to the character and sufficiency of the security, but refused to accept it, as the contracts were canceled. Mr. Matthews says that in this transaction he acted merely as agent of each party in making the sale, and assumed no responsibility.

The question in this case is, was there a binding contract between these parties? The answer will depend upon the force and effect given to the conclusion of Mr. Harris' letters to Mr. Matthews, the broker,—"subject to confirmation of A. S. Johnston." Matthews, after telegraphing Johnston of the offer of Harris, wires reply in short telegraphic terms to accept the offer. As presented to him, it was for the purchase of a certain number of bales of cotton, deliverable 100 bales per month, strict to good middling, at a certain price. That he assents to. Matthews, translating this, sets out the proposed contract in detail, one hundred bales per month, one-half strict and one-half good middling, deliverable at Moores, S. C., weights guarantied within three pounds; that is, three pounds per bale. This he communicates to Mr. Harris. Harris replies in the terms of Matthews' letter, accepting them, but adding the words above quoted, or words to that effect. What did he mean? Was this confirmation by Johnston to be an act in the future, upon the doing of which the contract would be complete? It was an act to be done in the future, Matthews communicating what Johnston would do. Harris accepts, provided Johnston will confirm what Matthews says. Matthews recognizes the propriety of this, for, as he says, they did not know him.

He also recognizes the usage in such cases; the mills always requiring it. And so he writes to Johnston, asking that he confirm direct to Harris; and when he gets a letter from Johnston, purporting to be a confirmation, returns it for correction, by adding important words. Nor is this unreasonable. The broker had no responsibility. The only evidence of his authority was a telegram in his own possession. They were dealing in an article (cotton) of fluctuating value. Harris was buying for the use of his mill, and had to be made certain of his supply. He wanted, and the usage justified him in wanting, the signature of the principal, so as to bind him beyond peradventure. It is suggested that this was only asked as a matter of record. If he simply wanted the name, so as to record on his books that he had purchased from Johnston, he already had that fact, and could have so entered it. The addition of these words by Harris to the offer made by Matthews then meant something. We cannot ignore them. At the least they seemed to change the terms of the proposal. "The acceptance of a proposal must be upon the identical terms of the proposal. The minds of the parties must meet on the same subject-matter in the same sense. And. Am. Law, p. 718, quoting Estes v. Furlong, 59 Ill. 300; Hot Springs Co. v. Harrison, 93 Va. 569, 25 S. E. 888; Hazard v. Insurance Co., 1 Sumn. 218, Fed. Cas. No. 6,282; Manufacturing Co. v. Hurd (C. C.) 18 Fed. 673. "Unless an offer is accepted on the terms on which it is made, it imposes no obligation." Tilley v. Chicago, 103 U. S. 155, 26 L. Ed. 374. So, until such confirmation by Johnston was received by Harris, the contract was not complete. Was this demand for confirmation waived. As has been seen, very shortly after the transactions above stated it was rumored that Johnston had failed, and doubts were entertained respecting his ability to perform the contracts. Thereupon Mr. Harris notified the broker, Mr. Matthews, that he would require security from Johnston, and gave him until 29th October to do this. No security having been furnished, Harris canceled the contract. Was this imposition of a new condition a recognition of an existing contract, and so a waiver of the fact that Johnston should confirm the contract? It is evident that if Mr. Harris had considered the contract complete he could not have imposed a new condition, one not inserted in the contract. His requirement of security showed that in his opinion the matter was still in fieri, and subject to his control. The fact, then, of his insistence on security showed that he had not waived his demand for confirmation by Johnston, and still considered the matter open. This being the case, he was at liberty to withdraw. Johnston's confirmation of the contracts did not come to him until after they were canceled. And the proffer of the security demanded came later than this. For these reasons the following findings of fact and conclusions of law are reached:

## Findings of Fact.

(1) The plaintiff is a citizen and resident of the state of Mississippi, and the defendant corporation, the Fairmont Mills, and L. Guy Harris, receiver, are citizens and residents of the state of South Carolina. (2) C. P. Matthews is a cotton broker at Spartanburg, S. C., doing business in the Carolinas. (3) On 10th October, 1900, negotiations

were entered into between W. J. Harris, president of Fairmont Mills, and C. P. Matthews, for the purchase of 300 bales of cotton strict to good middling at 10⅜ cents per pound, deliverable 100 bales each in the months of February, March, and April, 1901, at Moores, S. C.; and on 15th October, 1900, other negotiations were entered into between the same parties for the purchase of 200 bales of cotton at 10⅛ cents per pound, deliverable 100 bales each in the months of May and June, 1901, at Moores, S. C. (4) These negotiations culminated in a written offer on the part of Matthews, acting for A. S. Johnston, the plaintiff, for the delivery of the above-mentioned bales of cotton at the prices and terms and place specified, one-half of each delivery to be good and one-half strict middling, with the term added, "weights guarantied not to lose more than three pounds per bale." (5) Pending these negotiations telegrams had been passed between Matthews and Johnston, in which the outlines of the proposition were stated. The offer of Matthews gave the offer in detail, and for the first time. (6) The detailed offer of Matthews was accepted by Harris, subject to confirmation by Johnston. This is the usage of the trade in Spartanburg by the mills in purchasing cotton for future delivery. (7) The confirmation by Johnston not having been received, on 27th October, 1900, Mr. Harris, president of Fairmont Mills, canceled the transaction.

### Conclusion of Law.

The contract between plaintiff and defendant, never having been completed, was not binding, and the verdict must be for defendants.