18 Bloom.-Mich. Co. *v.* Coppes Bros., 141 Va. 18.

Statement.

# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

## Bloomberg-Michael Furniture Company, Inc. v. Coppes Bros. & Zook.

### January 15, 1925.

1. Contracts—*Correspondence—Existence of Contract for Court.*—It is the exclusive province of the court to determine the existence or non-existence of a contract based upon the correspondence between the parties.

2. Contracts—*Correspondence—Establishment of Contract—Future Negotiations.*—In order to establish a contract by correspondence there must appear upon the face of the correspondence a clear accession by both parties to one and the same set of terms. A proposal to accept or an acceptance on terms varying from the offer is a rejection of the offer. The acceptance must be unqualified, and no point left open for future consideration or negotiation between the parties.

3. Contracts—*Burden of Proof to Establish.*—The burden of proof to establish the existence of a contract is upon the party alleging a breach thereof.

4. Contracts—*Contract of Correspondence—Existence of the Contract—Case at Bar.*—In the instant case defendant asserted that correspondence between plaintiff and defendant established a contract under which plaintiff was obligated to accept all defendant's orders for kitchen cabinets during the year 1919, whereas plaintiff contended that the correspondence established only "a working arrangement" under which any orders taken and transmitted by defendant, and accepted and entered by plaintiff, would have to be furnished upon the terms and conditions outlined in the correspondence, and which would obligate the plaintiff to ship only those orders which were actually accepted.

   *Held:* That running through the entire record there was a thread of uncertainty as to the status of the parties; and nowhere did there appear in the correspondence the precise point "when there was a clear accession on both sides to one and the same set of terms;" the contract therefore was not established.

Error to a judgment of the Law and Equity Court of the city of Richmond, in a proceeding by motion for a

judgment for money. Judgment for plaintiff. Defendant assigns error.

*Affirmed.*

The opinion states the case.

*Harold S. Bloomberg,* for the plaintiff in error.

*Jo. Lane & Cary Ellis Stern, George Lewis Chumbley,* and *C. M. Chichester,* for the defendants in error.

CAMPBELL, J., delivered the opinion of the court.

The defendant in error, a corporation (hereinafter called plaintiff), instituted its action at law by notice of motion of judgment against the plaintiff in error (hereinafter called defendant), to recover the sum of $1,275.25. The defendant admitted the debt, but filed a cross action in the nature of a plea of set-off under the statute, claiming damages for the breach of an alleged contract upon the part of the plaintiff, and stated the damages to be $2,939.45.

There was a trial before a jury which resulted in a verdict in favor of the plaintiff for the sum of $1,004.05, upon which judgment was entered by the trial court, and it is this judgment we are asked to review.

The facts are: Plaintiff was engaged in the manufacture of a certain make of kitchen cabinet, with its principal office at Nappanee, Indiana, while the defendant was a wholesaler or jobber of general line of furniture in Richmond. The business of the defendant was conducted through salesmen who were supplied with photographs of the various lines of furniture carried by defendant.

All of the negotiations between the parties litigant were carried on by letter, and it is this correspondence

which presents the whole issue, as to whether or not a contract existed between the parties whereby the plaintiff was obligated to accept all of defendant's orders submitted during the year 1919, and to ship the cabinets in accordance therewith; or whether said correspondence established only "a working arrangement" under which any orders taken and transmitted by defendant, and accepted and entered by plaintiff, would have to be furnished upon the terms and conditions outlined in the correspondence, and which would obligate the plaintiff to ship only those orders which were actually accepted.

[1] The trial court, whose exclusive province it was in this case to determine the existence or nonexistence of a contract based upon the correspondence between the parties, adopted the view of the plaintiff, and over the objection of the defendant instructed the jury as follows:

1. "The court instructs the jury that the defendant admits being indebted in the amount of $1,275.25 with interest thereon from August 10, 1919, until paid, and the jury should find for the plaintiff for the said amount with interest from the said date, less such offsets as are established in accordance with the further instructions of the court.

"The court further instructs the jury that the correspondence in this matter does not amount to a contract in accordance with the contention of the defendant under which the plaintiff was bound to supply the defendant during the year 1919 with kitchen cabinets in accordance with certain terms and conditions, but said correspondence does establish a working arrangement under which any orders for kitchen cabinets taken and transmitted by defendant and accepted and entered by plaintiff would have to be furnished

under certain terms and conditions as outlined in the correspondence and evidence, and if the jury believe from evidence that the orders were taken, transmitted, accepted, and entered, they should allow as an offset against said claim of the plaintiff such damages as the jury under the evidence may find to have been occasioned to the defendant by the failure of the plaintiff to fill such orders.

2. "The court instructs the jury that if the plaintiffs accepted from the defendant any written orders for a definite number of kitchen cabinets, from time to time, and so notified the defendant, and the price and time of payment was understood between the parties—then as to any such orders there was a binding contract between the parties and the plaintiffs were under obligation to ship the goods within any period agreed upon or within a reasonable time after accepting the order unless defendant recalled the order or prevented the shipment from being made, but a mere refusal to pay an indebtedness already accrued from the defendant to the plaintiff would not by itself justify a refusal to fill the order according to the terms upon which it was accepted. If the jury find from the evidence that the plaintiff was under obligation to make shipment under any such order or orders given by the defendant and so accepted by the plaintiff, then the defendant is entitled to set-off against plaintiff's demand the loss, if any, the defendant has suffered by reason of the failure of the plaintiffs to furnish the defendant the kitchen cabinets so ordered. And the defendant's loss, in such event, is to be ascertained by the jury from all the evidence before them.

3. "The burden of proof is upon the defendant, which is in the position of plaintiff here, to establish its claims by a preponderance of the evidence. The pre-

ponderance of the evidence does not mean the greater number of witnesses, but it is the greater weight of all the evidence on both sides before the jury."

On motion of the defendant the following instruction was given:

"The court instructs the jury that if they find for the defendant on its counterclaims, or any of them, they must credit such amount on the amount due the plaintiff, but if the amount allowed the defendant exceeds the claim of the plaintiff, they must find a verdict for the defendant against the plaintiff for such excess, with interest thereon from the date of the plaintiff's breach of its contract.

As the determination of the correctness of the court's ruling depends upon the correspondence, all of the same must be considered in order to reach a proper conclusion.  This correspondence had its inception in a letter dated December 28, 1918, from the plaintiff to the defendant, which, omitting the formal parts, reads as follows:

"Referring to recent correspondence with us regarding cabinets for your good firm for the year 1919.  We beg to advise that we have decided not to sell kitchen cabinets under our trademark 'Dutch Kitchenet' to the jobbing trade in the future.  We are, however, bringing out a special line of cabinets which corresponds in a general way to our regular line, except that the upper doors are equipped with small glass panels and that there are minor changes in the inside door equipment.

"These will be sold to the jobbers under the jobbers name plate and no advertising or selling outfits of any sort will be furnished.

"These cabinets will be sold to the jobber at the same list as we sell to the dealer, and the jobber will be

Bloom.-Mich. Co. *v.* Coppes Bros., 141 Va. 18.    23

Opinion.

allowed twenty per cent trade discount; terms, net thirty days, f. o. b. the factory.    These are the same terms as those which we sell to the retailer.    These prices and discounts are subject to shipment in solid cars and are not for drop shipment.

"We are sending you a set of photographs of these cabinets today.    You will readily recognize our old models on the photographs although there are some changes, especially on the doors.    We think that the changes on the doors make a better appearing cabinet than the doors of our trade-marked line, but we do not feel justified in making these new doors for our trade-mark line, because we have already spent so much money in advertising and establishing our patterns as they now are with the consumers.

"These cabinets will be the equal in every way of the usual Dutch Kitchenets.    In fact they are the regular Dutch Kitchenets and nothing else.    They are guaranteed to prove satisfactory to you.

"We hope very much to be favored with your orders, which we will give you our prompt and careful attention.    We should like to know as soon as possible whether or not you are going to give us your business, because we have capacity for only a limited amount of jobbing business, and we understand that there is a great deal of it being offered.

"If you decide to give us the business let us know what you anticipate your probable requirements for the year will be and then we will arrange to take care of you.

"Wishing you a happy and prosperous New Year, and anticipating the pleasure of serving you, we are,

"Yours very truly,

"Coppes Brothers & Zook."

Then followed a letter dated January 2, 1919, as follows:

"Answering your letter of December 30th. We are temporarily out of photographs of cabinet No. 4476-19. We are, however, enclosing herewith a catalog picture of this number. It has just occurred to me that you might prefer a cabinet with the base of No. 4374-19 and the upper cupboard of the No. 4476-19. We enclose a list which shows the bases and tops separate and this combination would cost you $20.55.

"We enclose herewith a new Dutch Kitchenet list which goes into effect January 1st and have made notations on the same of the corresponding numbers on the list which we sent you. We have no corresponding numbers in the Dutch Kitchenet line which is like No. 4374-19.

"We absolutely have no discounts or quantity allowance or any terms to the retailer which are not shown on the Dutch Kitchenet list which we are enclosing. There is no quantity discount given the dealer of any sort, except the free cabinets listed under quantity allowances. The allowance the buyer gets with a carload of cabinets is four cabinets free with sixty.

"It is only by cutting out every bit of selling cost that we can maintain a list to the jobber the same as to our dealer and give the jobber twenty per cent discount. We are, therefore, compelled to charge all jobbers with the actual cost of photographs, half tones, etc., or whatever they may require. We do not charge any margin on this, and will be glad to furnish you the original invoices which are given us by the electrotypers, or the photographers, on anything that you order through us.

"We would not expect to sell any other jobbers in Virginia, or the two Carolinas, if you take hold of our line, but would expect to travel this territory with our

advertised line of Dutch Kitchenets, using our own salaried salesmen.

"You will notice the price guarantee which applied on our Dutch Kitchenet line. We are willing to let this guarantee apply on goods that you buy from us.

"Awaiting with interest your decision, we are,

"Yours very truly,

"COPPES BROTHERS & ZOOK,

"By H. E. Zook."

In answer the defendant replied, under date January 4, 1919, as follows:

"We have your valued favor of January 2nd and note contents carefully.

"We believe that this letter straightens matters out entirely satisfactory to us. We, of course, understood that you would have your representative working the Dutch Kitchenet in our territory. The only thing that we were particularly anxious about was that you would not sell any other jobber your line in Virginia, North and South Carolina, as it is our idea to take hold of your line with the view of pushing it for all it is worth, and selling just as much as we possibly can.

"We are going to step further than that, and allow our salesmen to sell your line on a basis that we have never attempted before. With your permission we are going to allow them to sell the goods at the same list price that you charge us, and at the terms that you allow your trade, as outlined in your price list dated January 1, 1919.

"Then, we are going to establish a warehouse price which would be in line with your warehouse price were you warehousing the goods in this territory, and we will warehouse the goods in Richmond, Va., and pay the same warehouse charges that you pay in other

places. This will, of course, necessitate your giving us the privilege of shipping your line two ways, one in carload lots to us at Richmond, and the other in either local or carload shipment direct to our customers throughout our territory, same being billed to us.

"If we could handle the line this way, we will then put our salesmen in the same position as you have your salesmen, that is enabling them to sell to the dealer from Richmond or from the factory on the same basis that you would sell to them. We feel sure that with a proposition of this kind and with our men knowing exactly the real value of your line, that they would unquestionably do a very large business on same.

"It will probably be thirty or sixty days before we could possibly put any of your goods in stock, as we now have on hand quite a quantity of another line that we recently bought when we could not get your goods. At our salesmen's conference just held we decided to cut the prices on those that we had on hand to actual cost in order to move them quickly, so that we can get your line started as soon as possible.

"We expect being able to move these in about thirty to sixty days, and then we will be able to start some of your goods about the first of March.

"We presume, of course, that you will give us the same guarantee regarding prices that you have on your dealer's list, so that we could in turn give it to our trade.

"In looking over the photographs of No. 4416-19 which you quoted us at $19.50 list, beg to state that we have not found a cabinet of this kind very salable. The trade seems to object to the open door proposition on the top, and much prefers the sliding door arrangement that you have on No. 4374-19. Wouldn't it be possible for you to give us a special consisting of No. 4476 base and with No. 4379 top at $19.50. We

realize, of course, that this probably makes a difference of about fifty cents to you, but if you could see your way clear towards doing it, we believe that it would help considerably in getting the boys to establish the line.

"So far as we are concerned, you can consider arrangements closed for handling your line for 1919 on the basis of our correspondence. As soon as we hear from you again, we will make up our initial order for shipment to come out as soon as possible for us to dispose of the cabinets now on hand.

"In your letter of December 26th you state that this new line will be sold to us under our own name plate, but that no advertising or selling outfits will be furnished. We understand from this that you are willing to put our name plates on all cabinets that you ship for our account. If this is correct let us know, so that we can get up a drawing of the name plate that we want to go on same.

"We will let you know how many photographs we will need in a few days.

"Regarding cuts, we think that we can very readily use the cuts that we already have on hand, as none of the cuts that we have show your name plate, and the cuts are near enough to the new photos to answer our purposes. Every one of the cuts that we show in our catalog at the present time are shown with the doors wide open, so that it will be impossible for them to tell whether they have small glass panels in them or not, and we can cover them by descriptive matter. Should we decide, however, later on that we want these, we understand that you will furnish them to us at cost.

"Yours very truly,

"BLOOMBERG-MICHAEL FURNITURE CO., INC."
MLB: JMW

Then follow numerous letters from which the following excerpts are taken (so as not to encumber this opinion with the entire correspondence, a great portion of which has no bearing on the question under consideration). Under date January 9, 1919, plaintiff wrote defendant:

"We are complimented to know that you will take on our line for this coming year.

"We feel, gentlemen, that our connection is going to be a mutually profitable and permanent business. We are hoping very much for the privilege of serving you over a period of years."

On April 26, 1919, defendant, for the first time, made reference to its requirements as follows: "In reference to the future requirements for the kitchen cabinets for the balance of the year. It has just occurred to us that you would like to have some information as to approximately how many cars we will want from June to the end of the year. We will certainly want at least two cars a month. We are writing you this so you can understand where we are on the kitchen cabinet proposition and we want you to take care of us on this as we are pushing your line exclusively on this line of merchandise. If you think it advisable you can book us for anywhere from six to twelve cars of these from now to the end of the year."

Plaintiff answered this letter under date April 29, 1919:

"We wish especially to thank you for your kind favor of April 25th, giving us a definite idea of your probable requirements on kitchen cabinets after June. We will not book the six to twelve cars that you suggest now, but will do our best to take care of you. We don't want to absolutely book these orders now because we don't want to bind ourselves on the matter of shipment

before we can tell better what the late spring and early summer will bring forth."

May 1, 1919, defendant wrote:

"We have your favor of April 29th, and note contents carefully. So far as booking the order for us for twelve cars is concerned, we are not really particular how you handle this matter, the thing that we wanted to impress was a line up on the minimum quantity of goods that we would want for the balance of this year and we hoped that you would try to make arrangements to see that we were properly taken care of. Understand that we are pushing your line of this class of cabinets exclusively."

May 8, 1919, defendant wrote:

"Reference to the order that you have on file for Goldenberg Brothers, Parkersburg, W. Va. Our salesman has just called to see this party again and it seems that we sold a couple of your cabinets and he writes us as follows regarding them: 'This party is in an exceptionally big hurry for these Dixie Maid Cabinets and he wants to place order for a car.' We, therefore, will deem it an especial favor if you will give this order preference and let the order that you already have for sample cabinets go forward at the very earliest opportunity."

Plaintiff, under date May 10, 1919, replied as follows:

"We will try to get this local order for Goldenberg Brothers at Parkersburg, W. Va., off in the very near future, but don't want you to take an order for a car from them for shipment until July or later, because we couldn't fill it.

"Labor conditions are very bad, and the output of our factory is not what it should be. We will do the very best we can on shipments for you, but cannot promise anything definitely now. We are very sorry

indeed that conditions are as they are, because they are hurting us worse than anybody else, but we don't want to make any promises that we cannot perform.

"Yours very truly,"

May 16, 1919, plaintiff wrote as follows:

"Referring to the matter of future business on kitchen cabinets, all the orders which we have on our books today will be filled in rotation at the prices and under the terms and conditions on which they were booked.

"After today our discounts to jobbers will be fifteen per cent from the list instead of twenty per cent on full carload shipments and twelve and one-half per cent discount from the list on less than carload shipments direct to the jobbers' customers.

"We are enclosing herewith a new list from which these discounts will apply. You will note that there is an advance of fifty cents per cabinet on three numbers, and $1.00 each on three numbers. These changes in the lists and changes in the discounts are made necessary by labor and material conditions over which we have no control.

"We will be unable to accept additional business at any price and discount for shipment until after June. We will, however, book business at the enclosed list price and discounts from you for shipment after July 1st. These prices and discounts are subject to change without notice, but will try to notify you of any change before it occurs.

"This is an identical form letter written to all the jobbing houses who have handled cabinets of our make."

Defendant replied:

"We, of course, are putting into effect the new price list on all new orders that we place through our salesmen. We certainly regret to note that it is necessary

for you to reduce your jobbing discount because this one feature alone enabled us to handle the line to a very good advantage; however, the writer will discuss this matter with you further when he sees you in Chicago, in the meantime we hope that you will get some goods off to us both for drop shipment to our customers and also for the cars."

After some further correspondence in regard to orders, shipments, etc., defendant wrote a letter under date July 17, 1919, containing for the first time any direct reference to an existing contract, as follows:

"From our standpoint we think there is no question but what you are obligated to take care of our wants for the year 1919 in cabinets, same to be billed to us at the same price that you charge your Dutch Kitchenet dealers, less twenty per cent discount."

Plaintiff replied July 21, 1919:

"We have gone through our correspondence with your house for the years 1918 and 1919 and cannot locate anything which might be construed as a contract or agreement that we would accept all the orders that you might send us for the year 1919."

Then follow several letters from attorneys representing the respective parties, which we deem unnecessary to refer to. As stated, the main question as to the existence of a contract between the parties is determinative of all other questions in the case, and it is to the correspondence quoted and otherwise appearing in the record we must look for a solution of the matter.

[2] In *Lynchburg Hosiery Mills* v. *Chesterfield Mfg. Co.*, 107 Va. 73, 57 S. E. 606, Judge Buchanan, delivering the opinion of the court, says: "It was held by this court in the case of *Virginia Hot Springs Co.* v. *Harrison*, 93 Va. 569, 25 S. E. 888, that in order to establish a contract by correspondence there must appear upon

the face of the correspondence a clear accession by both parties to one and the same set of terms. A proposal to accept or an acceptance on terms varying from the offer is a rejection of the offer. The acceptance must be unqualified and no point left open for future consideration or negotiation between the parties."

[3, 4] Applying this test to the evidence as shown by the correspondence, it must be concluded that the defendant, on whom was the burden of proof as to the plea of setoff, has failed to establish by a preponderance of the evidence the existence of a contract on which to base a recovery for a breach thereof.

Running through the entire record is a thread of uncertainty as to the true status of the parties. When notified by plaintiff, in the letter of April 29th, that it would "not book the six or twelve cars that you suggest now, but *will do our best to take care of you*," defendant, instead of then and there relying on a contract of requirement, merely expressed the regret that "*we hoped that you would try to make arrangements* to see that we were properly taken care of."

Again when notified by plaintiff, in letter of May 16th, as follows:

"After today our discounts to jobbers will be fifteen per cent from the list instead of twenty per cent on full carload shipments, and twelve and one-half per cent discount from the list on less than carload shipments direct to the jobbers' customers. We will be unable to accept additional business at any price and discount for shipment until after June." Defendant, instead of absolutely relying on the twenty per cent discount as contended by it to be the basis of discount under the contract, and demanding the fulfillment of its requirements, wrote the plaintiff May 27, 1918:

"We certainly regret to note that it is necessary for

you to reduce your jobbing discount because this one feature alone enabled us to handle the line to a very good advantage. * * *"

That the plaintiff considered the arrangement merely a working one is evidenced by a letter in regard to name plates which it was incumbent upon defendant to purchase. This letter, of date January 28, 1919, is as follows:

"We are about to order some celluloid name plates for *our cabinets* we are to furnish you, and we wish to ask how many of these we should buy, inasmuch as we are buying them for your *account*." (Italics supplied.)

The use of the word "account" is clearly indicative of the view plaintiff had of the existing status. In reply to the foregoing letter defendant wrote:

"Answering your favor of January 26th, we beg to state that we think it will be advisable for you to order 1,000 name plates for us."

Throughout the correspondence we find such expressions from defendants as the following: "It will probably be thirty or sixty days before we could possibly put any of your goods in stock."

"We *presume*, of course, that you will give us the same guarantee regarding prices that you have on your dealers list, so that we could in turn give it to our trade."

"* * want you to take care of us * *"

"You will *recall* that you gave us the *privilege* of taking orders for drop shipment at certain prices."

If we had any doubt as to the conclusion we have reached, the same would be removed by the following letter written by defendants:

"January 18, 1919.

"Coppes Bros. & Zook,"

"Napanee, Indiana.

"Gentlemen:

"If you can see your way clear toward taking on another jobbing account we will greatly appreciate and consider it a favor if you will send a set of photographs, price lists and quotations—same as you gave us—to Royal Furniture Company, attention Mr. Sam Levenson, Baltimore, Md. This is practically the same firm as Levenson & Zenitz. We feel sure that you will find it a very favorable account if you can see your way clear towards taking it on."

This letter clearly demonstrates that defendant considered that, instead of having a contract with plaintiff, it was merely a purchaser of goods "on account"; that it desired the Royal Furniture Company not to have the same contract, but to be permitted to have the same "jobbing account" and to be furnished with "quotations"—"same as you gave us." Again, "we feel sure that you will find it a very favorable account * *" not favorable contract.

Nowhere does it appear in the correspondence, the precise point, "when there was a clear accession on both sides to one and the same set of terms."

It follows, therefore, that the contract relied upon by the defendant has not been established by satisfactory proof and the ruling of the trial court is correct, and the judgment must be affirmed.

*Affirmed.*