COURT OF APPEALS OF VIRGINIA

Present:   Judges Friedman, Frucci and Senior Judge Humphreys
Argued at Fredericksburg, Virginia

UNPUBLISHED

PW LIMITED PARTNERSHIP

MEMORANDUM OPINION[*] BY
v.      Record No. 0726-23-4             JUDGE FRANK K. FRIEDMAN
FEBRUARY 11, 2025

LIEM NGUYEN, ET AL.


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Richard E. Gardiner, Judge

Sean Patrick Roche (Cameron/McEvoy PLLC, on briefs), for
appellant.

Kevin M. O'Donnell (Henry & O'Donnell, P.C., on brief), for
appellees Liem Nguyen, Quynh-Huong Nguyen, Hung Tran, Tai T.
Nguyen, Anh Thy N. Nguyen, and Phuong-Tan T. Nguyen.

No brief or argument for appellees Alicia Tran, Jennifer Tao, Ken
Tao, Allen Tai Diep, Dieu T. Vu, and Thang Tran.


This appeal involves the efforts of a landlord, PW Limited Partnership, to keep prior tenants

of a commercial property jointly and severally liable, along with successive tenants, for any rental

payment deficiencies.[1]  The lease and "assignment" history spans several decades.  PW filed an

unlawful detainer action against Passion Nail & Spa, Inc., and five other defendants in the Fairfax

County General District Court seeking possession of the property and $167,995.89 in unpaid rent.

The general district court ruled for PW as against Passion Nail & Spa, Inc., and ruled for the

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] For simplicity the tenants will be referred to as follows: The first tenant (Ken and
Jennifer Tao), the second tenant (Thang Tran), the third tenant (Allen Tai Diep and Alicia Tran),
the fourth tenant (Liem T. Nguyen, Quynh-Huong Nguyen, and Hung Tran), the fifth tenant (Anh
Thy N. Nguyen and Tai T. Nguyen), and the sixth tenant (Passion Nail & Spa, Inc.).

remaining defendants.  PW appealed the judgment to the circuit court.  After PW presented its case in the circuit court in a bench trial, the tenants made a motion to strike.  The circuit court granted the motion based on the defense's theory that there was no proper assignment of the lease between the third and fourth tenants at the time the ownership of the business transferred in 2003—causing a break in the chain that rendered all subsequent assignments a legal nullity.  The trial court also concluded that the third lease ended in 2007 and with its expiration, any obligations of tenants one, two, and three also ended.  PW now appeals, claiming the circuit court's decision was erroneous and that all prior tenants are jointly and severally liable for the rent deficiencies of the sixth tenant.

BACKGROUND

*Lease History*

The commercial lease property at issue is a retail space used for operating a nail salon.  From 1994 to 2022, the nail salon was sold five times.  At the time of each sale, PW was the landlord of the property.  The original tenants signed a lease in July 1994.  The first tenant extended the lease from its scheduled expiration in September 2000 to September 30, 2002.  On June 11, 1997, the first and second tenants executed a "Contract To Sell Business Known As 'Nail Plus.'"  On August 28, 1997, PW, the first tenant, and the second tenant entered into an "Agreement of Assignment of Lease And Assumption Of Obligations," which provided in pertinent part:

> 2. **Assignment.**  Assignor hereby grants, transfers and assigns to Assignee, all of Assignor's right, title, interest and estate in and to the Lease (including the security deposit held by Landlord under the Lease), to have and to hold same unto Assignee, its successors and assigns for the period from and after the date hereof through the remaining term of the Lease (including any renewal, extension or modification thereof).
>
> 3. **Acceptance.**  Assignee hereby accepts such Assignment, and for the benefit of Assignor and Landlord and their respective successors and assigns, assumes the performance of all of Assignor's obligations under the Lease for the period from and after the date hereof through the expiration of the Lease (including any renewal, extension or modification thereof).

4. **Acknowledgment Regarding Assignor.** Assignor acknowledges and agrees, for the benefit of Landlord and Landlord's successors-in-interest, that Assignor shall remain liable, jointly and severally, for the performance and observance of the covenants and conditions in the Lease (including any renewal, extension or modification thereof).

5. **Landlord Consent.** Landlord, in consideration of the undertakings herein of the Assignor and Assignee, hereby consents to the assignment of the lease hereunder.

The lease required that PW agree to the assignment: "Tenant shall not assign this Lease . . . without first obtaining the written consent of Landlord . . . . Any attempted assignment . . . without Landlord's prior written consent shall be void." Lease at ¶ 35. Paragraph 41 of the lease agreement included this language: "It is understood and agreed that this Lease contains the entire agreement between the parties and shall not be modified in any manner except by an instrument in writing executed by the parties hereto."

On December 17, 2001, the second and third tenants executed a contract agreement "to sell the Nail Plus Salon." On June 4, 2002, PW, the second tenant, and the third tenant entered into a "Second Agreement of Assignment of Lease And Second Assumption Of Obligations," which, in pertinent part, was identical to the first agreement. The third tenant extended the lease from September 30, 2002, to September 30, 2007.

PW, the third tenant, and the fourth tenant did not enter into an assignment as PW had done in the past. The third tenant sold the business to the fourth tenant in October 2003. On February 27, 2004, PW and the fourth tenant entered into an "Assumption Of Lease and Lease Obligations," in which the fourth tenant: "assume[] all of Third Tenant's right, title, interest, and estate in and to the Lease . . . for the period from and after the date hereof through the remaining term of the Lease (including any renewal, extension, modification, or assignment thereof) . . . ." Assumption at ¶ 3.

The "Assumption" also states:

> Even though Original Tenant, Second Tenant, Third Tenant and Guarantors *are not signatories to this Assumption*, nothing herein shall be construed to relieve any of the *foregoing parties* from any of their respective obligations under the terms and conditions of the Lease (including any renewal, extension or modification thereof) and/or under the Guaranty. Original Tenant, Second Tenant, Third Tenant and Guarantors shall remain liable, jointly and severally, for the performance and observance of the covenants and conditions in the Lease (including any renewal, extension, modification, or assignment thereof (i.e., their liability is not affected, modified, or diminished by reason of this Assumption, and their obligations now includes the provisions of the Lease, as assumed under this Assumption).

Assumption at ¶ 6 (emphases added).

On December 7, 2006, the fourth tenant signed an extension of the lease from September 30, 2007, to September 30, 2012; no prior tenant signed the extension.[2] Also on December 7, 2006, the fourth tenant attempted to assign the lease to the fifth tenant. On April 15, 2008, the fifth tenant extended the lease from September 30, 2012, to September 30, 2017; again, no prior tenant signed

---

[2] The "Third Amendment and Extension of Lease" also provided:

> Although Original Tenant, Second Tenant, Third Tenant and Guarantors *are not signatories to this Third Amendment*, nothing herein shall be construed to relieve any of the *foregoing parties* from any of their respective obligations (or reduce or limit any such obligations) under the terms and conditions of the Lease (as amended by this Third Amendment) and/or under the Guaranty. Original Tenant, Second Tenant, Third Tenant and Guarantors shall remain liable, jointly and severally, for the performance and observance of the covenants and conditions that accrue under the Lease (as amended by this Third Amendment) for the benefit of Landlord and Landlord's successors-in-interest through the expiration of the Lease (as amended by this Third Amendment) (including any renewal, extension, modification, and/or assignment thereof).

Third Amendment and Extension of Lease at ¶ 6 (emphases added).

the extension. On that same day, the fifth tenant entered an assignment of the lease to the sixth tenant, a corporate entity.

On August 5, 2016, the sixth tenant amended the lease, but did not extend it; no prior tenants signed the amended lease. This amendment acknowledged that the sixth tenant had amassed an arrearage of $137,345.89 through April 30, 2015. On August 31, 2016, the sixth tenant extended the lease from September 30, 2017, to September 30, 2022; no prior tenant signed the extension. The sixth tenant again failed to pay rent beginning in 2020, and amassed a total shortfall of $177,313.12 before PW filed suit in 2021.

Through these machinations, PW asserts it kept each tenant from 1994 forward liable for any nonpayment by any other future tenant.

*Trial Court Proceedings*

On May 3, 2021, PW filed an unlawful detainer action suing all six tenants in general district court for rent defaults by the sixth tenant. PW alleged that all the tenants were jointly and severally liable under the lease for the sixth tenant's nonpayment of rent. The general district court found in favor of PW as against Passion Nail & Spa, Inc., and ruled in favor of the remaining defendants. PW appealed the judgment to the circuit court.[3] In the circuit court proceedings PW presented the case relying extensively on the contract documents themselves, with testimony from the custodian of the records to lay the foundation. No parol evidence was presented to explain the contents of the lease agreements.

After PW presented its case, the tenants argued on a motion to strike that: 1) the lease was extended without the prior tenants' written permission, which nullified their liability; 2) the statute of limitations extinguished PW's claims; and 3) there was no proper assignment of the lease

---

[3] The sixth tenant is not a party to this appeal. A judgment was entered against the sixth tenant at the general district court level and was never appealed. PW asserts it can enforce this judgment against the prior tenants.

between the third and fourth tenants at the time the ownership of the business transferred, causing a break in the chain of liability from the fourth tenant through the nonpaying sixth tenant, thus relieving all of the prior tenants from liability. The circuit court granted the motion to strike, crediting the "break in the chain" theory.

While hearing arguments the court noted that "[t]his, to me, is a plain language case." The trial court found that the third tenant "had all the right, title, and interest to the property once they were assigned it, and they've never assigned it to anybody else." Thus, the trial court held the lease ended in 2007 at the end of the third tenant's term, and therefore none of the first three tenants could subsequently be held liable for obligations past that term date. The court emphasized that after the second agreement of assignment of the lease "there is no further assignment of the lease going . . . to anybody." Under the trial court's logic, this finding of a break in the chain also relieved tenants four and five of liability under the lease.

PW filed a motion to reconsider, arguing that the bill of sale between the third and fourth tenants implicitly included a lease assignment, that this implicit assignment was retroactively adopted and ratified by the fourth, fifth, and sixth tenants, and that defendants had waived their "break in the chain" argument because it constituted an affirmative defense that defendants failed to plead prior to trial. The circuit court issued an opinion letter denying the motion for reconsideration and dismissing the case with prejudice.[4]

This appeal followed.

---

[4] In its opinion letter, the court again noted that there was a break in the chain of assignments. The court stated that "There is no doubt that [PW] and the third and fourth tenants did not enter into an [assignment] as had been done by [PW] and the first and second tenants, and by [PW] and the second and third tenants." The court concluded that "unlike the second and third tenants, the fourth tenants did not agree to 'assume[] the performance of all of [the third tenant's] obligations' . . . under the Lease 'through the expiration of the Lease (including any renewal, extension or modification thereof).'" The circuit court concluded that when the fourth tenant was not assigned these responsibilities, the chain was broken, and the obligations were not passed to subsequent tenants either.

ANALYSIS

I. *The Tenants Did Not Waive Their Argument Concerning a Defect in the Chain of Assignments*

PW suggests that the tenants were required to raise their position that the lease expired after the third tenant's term concluded as an affirmative defense at the pleadings stage of the lawsuit. This argument misconstrues the burden of proof in this case.

At the conclusion of PW's case in chief, the tenants moved to strike PW's evidence given its insufficiency.[5] The tenants' arguments challenged the sufficiency of PW's evidence and were not affirmative defenses. "The elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Ramos v. Wells Fargo Bank*, 289 Va. 321, 323 (2015) (quoting *Filak v. George*, 267 Va. 612, 619 (2004)); *see also Bloomberg-Michael Furniture Co. v. Coppes Bros. & Zook*, 141 Va. 18, 19 (1925) ("The burden of proof to establish the existence of a contract is upon the party alleging the breach thereof."). Thus, the burden was on PW to establish the existence of a valid contract and breach of that contract. Because that burden was on PW, the tenants were free to argue to the court, on a motion to strike, that PW had not met its burden.

The trial court properly determined that the "break in the chain" argument was not waived:

> Defendants' argument on the motion to strike was not a "defense"
> that had to be pled; Defendants' argument instead focused on a
> deficiency in Plaintiff's case-in-chief at trial. In light of Plaintiff's
> own evidence establishing that the third tenants did *not* assign the
> Lease to the fourth tenants, Defendants could argue on their motion

---

[5] The applicable standard of review requires that this Court "view the evidence and all reasonable inferences therefrom in the light most favorable to the plaintiff whose evidence was struck." *Costner v. Lackey*, 223 Va. 377, 381 (1982) (observing that "[i]n considering a motion to strike the plaintiff's evidence, a trial court is required to resolve any reasonable doubt as to the sufficiency of the evidence in favor of the plaintiff").

to strike that Plaintiff had failed to meet its burden of showing a valid contract and a breach of that contract.

We agree with the trial court that no waiver occurred here.

II. *The Trial Court Correctly Found that the Lack of Any Assignment of the Lease from the Third Tenant to the Fourth Tenant Resulted in the Expiration of the Liability Provisions of the Lease at the End of the Third Tenant's Term*

The trial court's granting of the motion to strike plaintiff's evidence below was based upon PW's own documents evidencing a failure to establish any assignment as between the third tenant and fourth tenant. In analyzing the lease, the trial court found that the third tenant "had all the right, title, and interest to the property once they were assigned it, and they've never assigned it to anybody else." Accordingly, the trial court held that the lease ended in 2007 at the end of the third tenant's term. The court reasoned that tenants one, two, and three could not be deemed liable for obligations extending beyond that date. The circuit court's holding as to the first three tenants is fully supported by the lease documents.

PW attempts to transform the 2003 purchase of the nail salon business between tenant three and tenant four into an assignment of the lease. However, a reading of the contract confirms that there is no reference of any kind to the lease or to any "sale" or assignment of the lease in that transaction. As the trial court succinctly summarized:

> None of the sales contracts reference a sale of the Lease; the first sale contract references sale of the assets of the business, the second and third sale contracts reference the sale of the business, the fourth sale contract references the sale of business assets, and the fifth purported sale contract is actually merely a letter of intent to sell the assets of the business.

In addition to the lack of clear contractual evidence of an assignment, the tenants contend that the record provides no indication of the putative assignor's—tenant three's—intent to assign. Tenants assert the subsequent assumption agreement between the landlord and tenant four cannot effectuate an assignment of the lease without a corresponding assignment from the

tenant then holding the leasehold interest, in this case tenant three. Tenants claim, "[t]o hold otherwise would be to hold that a third party may unilaterally take over and 'assume' any lease in which the tenant has vacated the leased premises."

Tenants argue that in this context a unilateral alteration or assignment of a contract cannot bind a party who does not grant consent. They contend that in Virginia, when a contract "contains mutual obligations and liabilities, or involves a relation of personal confidence, it cannot be assigned by one party without the consent of the other." *J. Maury Dove Co. v. New River Coal Co.*, 150 Va. 796, 827 (1928).[6] The tenants, accordingly, argue the lease contained mutual obligations and any assignment of these responsibilities would have required the consent of tenant three who still held a leasehold interest. In the absence of evidence of tenant three's consent, no assignment occurred.

The law of assignments in Virginia supports this logic. The Supreme Court of Virginia has stated that a valid assignment requires evidence of intent of the assignor. *Kelly Health Care, Inc. v. Prudential Ins.*, 226 Va. 376, 381 (1983) ("The intention of the assignor is the controlling consideration."). In *Kelly*, the Court observed:

> An assignment is a transfer, but a transfer is not necessarily an assignment. If the transfer is less than absolute, it is not an assignment; *the obligee must have intended, at the time of the transfer, to dispossess himself of an identified interest, or some part thereof, and to vest indefeasible title in the transferee. See* Restatement (Second) of Contracts § 317(1) (1981).

*Id.* at 379 (emphasis added).

The assumption agreement fails to create an assignment of the third tenant's interests in the lease (which at that time extended to a term ending in 2007); nor was it signed by the third

---

[6] It is also clear that a lease is a contract under Virginia law. *See, e.g.*, *Landmark HHH, LLC v. Gi Hwa Park*, 277 Va. 50, 55 (2009) (stating that "A lease is a contract . . . .").

tenant.[7] The absence of a specific assignment in the record between the third and fourth tenants is inescapable. In sum, PW's evidence below contained no assignment from tenant three, and no evidence of tenant three's "intent" to assign the remaining leasehold interest or to vest that interest in tenant four. Thus, the trial court correctly concluded that there was no assignment between the third and fourth tenants. This was a proper basis for granting the tenants' motion to strike as to tenants one, two, and three—and the ruling means that the initial lease was extinguished at the end of the term in 2007, cutting off any potential liability for tenants one through three for future failures of payment.

III. *The Granting of the Motion to Strike was also Appropriate as to Tenants Four and Five, but for a Different Reason than the "Break in the Chain" Theory Embraced by the Trial Court*

PW argues that, after tenant four "assumed" the lease rights in 2004, its obligations—whatever they were—passed to subsequent tenants under "contractual principles of ratification, adoption, assumption, and/or assignment." Per this logic, even if the first three tenants escaped liability, tenants four and five would be liable for tenant six's arrearages.

A. *The Landlord-Tenant Relationship After 2007*

PW argues that tenants four and five remain on the hook for tenant six's nonpayment because the landlord "ratified" the original lease under the assumption agreement and then tenant four assigned it to tenant five. The contract of sale between tenants three and four specifies a date of sale of October 15, 2003. The assumption agreement, under which PW claims it ratified the "assignment" effected by tenant three's sale of the business, was not entered into until February 27, 2004. Hence, the trial court held that the purported "assignment" claimed by PW as to the sale of business assets was rendered void by the plain terms and language of the lease itself:

---

[7] Nor was it signed or endorsed by any of the prior tenants who allegedly remained "jointly and severally" liable under the lease.

"Any attempted assignment . . . without Landlord's *prior* written consent shall be void." Lease at ¶ 35 (emphasis added).[8]

Relying on this language, the tenants argue that the subsequent leases are "void" attempts to resuscitate the original lease and that this freed them from further obligations. PW argues that the lease language makes the retroactive action "voidable, not void." While this interpretation is at odds with the contractual language, Virginia precedent supports the proposition that a landlord can waive such provisions.[9] We are left to analyze the landlord-tenant relationship between PW and its tenants after 2007 when tenant three's lease term ended. Even in the absence of an assignment from tenant three to tenant four, tenant four did execute an "assumption" with PW and this signed agreement governed their dealings and was passed on to subsequent tenants.

---

[8] Notably, void contracts and acts may not be ratified. *See, e.g.*, *King v. Donnkenny, Inc.*, 64 F. App'x 376, 378 (4th Cir. 2003) (holding that "[a]lthough a voidable contract can be ratified, . . . a void contract cannot" (internal citations omitted)); and *Princess Anne Hills Civic League, Inc. v. Susan Constant Real Est. Tr.*, 243 Va. 53, 61 (1992) (holding that "[u]nlike a void act, a voidable act may be the subject of ratification").

[9] Usually "void" transactions are those which are illegal or which a party did not have the legal power to make. *E.g.*, *Richmond, F. & P. R. Co. v. Richmond, F. & P. & R. & P. R. C. Co.*, 145 Va. 266, 298-99 (1926) (contract by a corporation which was ultra vires and "beyond the powers conferred on [the corporation] by the legislature, [was] not voidable only, but wholly void and of no legal effect"); *Dellinger v. Foltz*, 93 Va. 729, 734 (1986) (contract made during infancy was void). By contrast, a "voidable" act tends to involve something a party could do, but failed to do properly. *Princess Anne Hills Civic League, Inc.*, 243 Va. at 61 ("[B]ecause the Civic League merely failed to do properly what it had the power to do, we conclude that the purported transfer of Parcel A to the Trust was not void, but voidable."). And "[u]nlike a void act, a voidable act may be the subject of ratification." *Id.*

For example, in *Keepe v. Shell Oil Co.*, 220 Va. 587 (1979), the lease of a gas station prohibited assignment without the lessor's written consent. *Id.* at 589. The lessee assigned the lease without written consent, but asserted that the assignee corporation "conducted the business with the knowledge and consent of [the lessor]." *Id.* The circuit court held that the assignee corporation was not a proper party to the case (which dealt with recovering damages from the lessor) because the assignment had been made without consent, so the assignee had no property interest in the lease. *Id.* at 590. The Supreme Court reversed, holding that the circuit court erred and that the lessor would be taken to have waived the requirement of written consent upon proof of the assignee's operating the business "with the knowledge and consent of [the lessor]." *Id.*

The circuit court exclusively relied on the break in the chain theory in concluding that none of the tenants were liable for the sixth tenant's failure to pay rent once the original lease ended. But the break in the chain theory is not sufficient alone to support a conclusion that the fourth and fifth tenants were not liable. When a tenant takes possession of a premises under a void lease, a tenancy may nonetheless be implied by law. *See Game Place, L.L.C. v. Fredericksburg 35, LLC*, 295 Va. 396, 413-15 (2018);[10] *see also Rubin v. Gochrack*, 186 Va. 786, 794-95 (1947) (the law presumes a hold-over to be upon the terms of the original lease; the presumption can be rebutted). Ultimately, the fourth, fifth, and sixth tenants had a lease relationship of some kind with PW, regardless of the validity of the assignment between the third and fourth tenants. Put another way, the fourth and fifth tenants signed agreements with PW and agreed to be responsible for the agreements they signed. Thus, we find that the circuit court was incorrect in concluding that the break in chain theory wholly exonerated tenants four and five from liability from tenant six's rent deficiencies. Nonetheless, we will, for the reasons set out below, affirm the trial court's ruling under the "right for the wrong reason" doctrine.[11]

---

[10] *Game Place* involved a lease that was void for failure to comply with the seal requirement of Code § 55-2. As the *Game Place* decision notes: "The agreement, though . . . void as to the term and the interest in lands sought to be created, regulates the relations of the parties to it in other respects upon which the tenancy exists, and may be resorted to [in order] to determine their rights and duties . . . ." 295 Va. at 414 (first alteration in original) (quoting *Reeder v. Sayre*, 70 N.Y. 180, 184 (1877)).

[11] "The 'right result for the wrong reason' doctrine has been a part of the law of Virginia for well over a century." *Spinner v. Commonwealth*, 297 Va. 384, 391 (2019). Under the doctrine, "the appellee [is] free to defend his judgment on any ground properly raised below whether or not that ground was relied upon, rejected, or even considered by the [trial court] or the Court of Appeals." *Id.* (alterations in original) (quoting *Perry v. Commonwealth*, 280 Va. 572, 581 (2010)). "We do not hesitate, in a proper case, where the correct conclusion has been reached but the wrong [or a different] reason given, to sustain the result and assign the right ground." *Taylor v. Northam*, 300 Va. 230, 251 (2021) (alteration in original) (quoting *Banks v. Commonwealth*, 280 Va. 612, 617 (2010)).

B. *PW Cannot Hold the Prior Tenants Liable Under Subsequent Modified Documents that Were Not Signed or Agreed to by Them in Any Manner*

Despite our rejection of PW's argument that the original lease remains viable from its inception, PW also contends—as part of its "ratification" theory—that under the assumption entered in 2004, tenant four agreed to be bound to the lease terms during any renewal of the lease. PW asserts that since the agreement was later renewed or extended through 2022, tenant four remains liable as a guarantor for tenant six's subsequent arrearages. Under this same logic, PW claims tenant five also accepted this term and also remains a guarantor of tenant six's rent payments. Although neither tenants four or five gave written consent to the renewals or modifications that tenant six entered, PW suggests that the prior tenants remain bound by the dubious bargains they accepted when they agreed to remain liable during subsequent renewals or modifications of the lease.[12] PW then argues that Virginia law holds parties to the ill-advised bargains they freely strike, no matter how unwise they may be. *Lucy v. Zehmer*, 196 Va. 493, 502 (1954) (holding the outward expression of intention, rather than subjective belief of intention, creates a legally binding contract).[13]

Tenants raise several alternative reasons for upholding the trial court's ruling under the right for the wrong reason doctrine. The tenants' primary argument below was that the first through fifth tenants cannot be held liable for the subsequent assignments, extensions, and

---

[12] PW relies upon *9625 Lee Highway, LLC v. Va. Garden Rests., LLC*, 58 Va. Cir. 178 (Fairfax 2002), for the proposition that earlier tenants can agree to be bound by future amendments if contract terms are followed. However, that case involved a question of whether or not a mandatory notice provision of a lease was a covenant that could be asserted by a subsequent tenant/assignee. More importantly, all parties in the case had taken their place in the chain of title via proper lease assignments.

[13] PW notes that, under the language of the various assignments, all tenants "remain liable, jointly and severally, for the performance and observance of the covenants and conditions of the Lease (including any renewal, extension or modification thereof)."

modifications of the lease, which were completed in each case without the tenants' written permission.[14]

The tenants contend that modifications regarding the identity of a new tenant and how long a lease is extended are highly material to one purportedly accepting ongoing liability on a lease. They note that the common law requires that if a contract is altered, it is not enforceable against a party who did not consent to such alteration. *See Consumers Ice Co. v. Jennings*, 100 Va. 719, 724 (1902); *see also Hening v. Maynard*, 227 Va. 113, 117 (1984) (finding that, in a restrictive covenant context, in the absence of an agreement to the contrary, existing restrictions cannot be amended or terminated unless all parties affected by the restrictions, or their successors, agree to the amendment or termination).

Indeed, fundamental contractual principles dictate the same result. Certainty and completeness are "essential element[s] of a valid contract." *Dean v. Morris*, 287 Va. 531, 537 (2014) (quoting *Smith v. Farrell*, 199 Va. 121, 127 (1957)). "The element of completeness denotes that the contract embraces all the material terms; that of certainty denotes that each one of those terms is expressed in a sufficiently exact and definite manner." *Id.* (quoting *Smith*, 199 Va. at 127-28). "It is crucial to a determination that a contract exists . . . that the minds of the parties have met on every material phase of the alleged agreement." *Chittum v. Potter*, 216 Va.

---

[14] Under this argument, each tenant's liability extended only for the duration of the last agreement they signed. For example, the first tenant's liability would end at the expiration of the first amended lease (September 30, 2002), which was the version in effect when it assigned the lease to the second tenant. The fifth tenant's liability would end at the expiration of the fourth amended lease (September 30, 2017), which was the version in effect when it assigned the lease to the sixth tenant. As the parties recognized, a proper assignment of a lease does not relieve the lessee from liability during their original lease term even where the lessor consents to the assignment. *See Cavalier Square Ltd. P'ship v. Virginia Alcoholic Beverage Control Bd.*, 246 Va. 227, 231 (1993).

463, 467 (1975).[15] The tenants insist that they never agreed to waive their right to consent to material changes to the contract, if they were to be bound by them.

PW counters, again, that a tenant's rights to notice and approval of modifications can be bargained away. *Lucy*, 196 Va. at 502 (a party to a contract is bound by contract terms, not subjective intent). However, the documents here do not support claims that the tenants abandoned the right to consent to material modifications in the future. In fact, the express language of the lease, upon which PW purports to rely, requires that any manner of modification must be executed by the parties to the lease—and under PW's own theory of the case, each of the prior tenants remained a party under the lease. *See supra* at 3, Lease at ¶ 41. None of the lease extensions were signed by any of the prior tenants. In fact, each contained a written acknowledgment that prior tenants *had not signed* or endorsed the lease extensions. This is problematic to any effort to enforce the lease extensions against the prior tenants—who did not sign—because the plain terms of the lease itself provide that the terms "shall not be modified in any manner except by an instrument in writing executed by the parties hereto." Lease at ¶ 41.[16] Here, even if the initial lease were still in force (or implied through the assumption), as PW claims, the prior tenants would be entitled to the benefits of Paragraph 41, and this forecloses

---

[15] Further, "[i]t is 'well settled under Virginia law that agreements to negotiate at some point in the future are unenforceable.'" *Navar, Inc. v. Fed. Bus. Council*, 291 Va. 338, 346 (2016) (quoting *Cyberlock Consulting, Inc. v. Info. Experts, Inc.*, 939 F. Supp. 2d 572, 578 (E.D. Va. 2013), *aff'd*, No. 13-1599, 549 Fed. Appx. 211 (4th Cir. Jan. 8, 2014)). Even an agreement to "negotiate open issues in good faith" will be considered an unenforceable "agreement to agree rather than a valid contract." *Id*. at 346-47 (quoting *Cyberlock*, 939 F. Supp. 2d at 578); see also *Moorman v. Blackstock, Inc.*, 276 Va. 64, 76 (2008) ("Additionally, where parties intend to culminate their agreement with a signed contract, there is a strong presumption that no contract exists until a contract is formally signed and in writing."); *Golding v. Floyd*, 261 Va. 190 (2001) (same).

[16] To hold otherwise would mean that, despite Paragraph 41, the landlord could, without notice to prior tenants, pick an insolvent drifter to serve as a future tenant and, upon his nonpayment, demand that the prior tenants pay the inevitable deficiency.

PW's attempts to introduce new tenants and lease terms to the contract and somehow bind the prior tenants under terms that they never agreed to in writing or otherwise.

Finally, this conclusion is also consistent with the law of guaranty and suretyship—which is analogous here as PW essentially argues that the prior tenants agreed to serve as sureties for future tenants' non-payments for as long as the agreement was renewed. PW's argument ignores one critical principle: Any variation in the surety's agreement, which may prejudice him or amount to the substitution of a new agreement, if made without his knowledge or consent, will discharge him. *Kirschbaum v. Blair*, 98 Va. 35, 36 (1900). Similarly, when one accepts a surety obligation, the surety undertakes a calculated risk, and when the recipient of the promise to pay materially increases that risk, without consent of the surety, the obligation is terminated. *See Allstate Ins. Co. v. American Bankers Ins. Co.*, 882 F.2d 856 (4th Cir. 1989).

Here, during each lessee's lease term, the lessee remained bound following an assignment in that he vouched that his assignee would meet the terms of the contract through its term—and this is generally true even if the assignor accepted the lessor as a tenant. *See Cavalier Square Ltd. P'ship v. Virginia Alcoholic Beverage Control Bd.*, 246 Va. 227, 231 (1993); *Cooke v. Wise*, 13 Va. (3 Hen. & M) 463 (1809).[17] At the end of the lessee's term, however, this obligation

---

[17] As our Supreme Court has explained:

> [A] lessee in possession of property has two privities with his lessor: privity of contract and privity of possession. . . . [T]he existence of these two privities is the basis for the rule that an assignment of a lease, even with consent of the lessor, does not relieve the lessee of liability under the lease. All an assignment does is place possession in a third party. Thus, the original lessee is no longer in privity of possession with his lessor. However, the assignment has no effect on privity of contract, and the original lessee remains in privity of contract with his lessor.

*Jones v. Dokos Enters., Inc.*, 233 Va. 555, 557 (1987). Thus, barring a clear release, the original lessee remains liable to the end of the original lease term.

would generally end by operation of law; however, if the landlord seeks to hold tenants four and five liable for debts of future tenants, he cannot do so without their assent to the identity of any new tenant and the length of any extended term of new liability. It is logical and equitable that a material variation that increases the risk to the tenants cannot be enforced without their consent. *Kirschbaum*, 98 Va. at 36. The identity and solvency of a new tenant is clearly material to one pledged to cover that tenant's deficiencies.

Thus, PW's effort to hold the prior tenants accountable for tenant six's deficiencies falls under contract principles, basic surety and guaranty concepts, and the language of the lease upon which PW relies. When tenant four entered the "assumption" and later assigned it to tenant five, tenant four did not sign or agree to be responsible for tenant six's arrearages (outside of its original lease term) and tenant five did not agree to assume tenant six's non-payments (outside of its original lease term). The landlord's unilateral attempts to hold tenants four and five liable as guarantors for all future tenants' shortfalls are ineffectual absent the fourth and fifth tenants' consent to the *new* agreements. *See Jennings*, 100 Va. at 724 (if a contract is altered it is not enforceable against a party that did not consent to the material modification). Thus, we find that the right result was reached below because the tenants were not bound by extensions and material modifications to which they never agreed. There is one final caveat.

### C. *The Statute of Limitations Defense*

The tenants also advanced a statute of limitations defense under the right for the wrong reason doctrine. The tenants conceded at trial that the fifth tenant's liability extended to the expiration of the lease that it assigned to the sixth tenant. *See Cavalier Square*, 246 Va. at 231. That lease (the fourth amended lease) expired on September 30, 2017. Under the tenants' logic, the fifth tenant entered a lease with PW and, while passing it to the sixth tenant, remained liable

- 17 -

under their agreed lease term until it expired in 2017—but not for any modifications thereafter that they did not sign.

In August 2016, the sixth tenant and PW executed an amendment to the lease which included a provision stating that "Landlord and Tenant acknowledge that Tenant is in arrears in payment . . . under the Lease for the period through April 30, 2015 in the amount of [$137,345.89]." PW did not sue for the rent arrearage at that time, but extended the lease with tenant six to 2022 shortly thereafter. The sixth tenant then failed to pay again in 2020. PW filed this action seeking to recover the total unpaid rent, which included the amounts unpaid through April 30, 2015 (during tenant five's watch), and the amounts unpaid beginning in 2020 (for which tenant five has no responsibility).

Thus, part of the debt PW seeks to recover—the $137,345.89 incurred during or before 2015—falls within the fifth tenant's liability period because it was incurred before September 30, 2017. The fifth tenant conceded at trial that this portion of the debt accrued during its original lease term; however, tenant five argued that because PW did not file its unlawful detainer action until May 3, 2021, PW's claims with respect to that portion of the rent had expired under the five-year statute of limitations applicable to written contracts.[18] *See* Code § 8.01-246. "[C]ourts generally have agreed that for claims based on an installment contract, a cause of action accrues, and the statute of limitations begins to run, when each installment becomes due." *Am. Inn, L.P. v. SunTrust Banks, Inc.*, 28 Fed. Appx. 316, 320 (2002) (noting that "Virginia follows this general rule"). PW's own documents conclusively demonstrate that this portion of the debt was incurred before April 30, 2015; and PW offered no testimony to alter this concession. Thus PW's claims as to the debt incurred within the fifth tenant's liability period would be barred by

---

[18] Under claims that this commercial agreement was governed by an implied contract, the claim would also fall prey to the limitations defense. The statute of limitations for an unwritten contract, express or implied, is three years. Code § 8.01-246.

the five-year statute of limitations for breach of a written contract.[19]  Accordingly, the motion to strike was properly granted as to tenant five, albeit for a different reason than the one embraced by the trial court.  *See Spinner v. Commonwealth*, 297 Va. 384, 391 (2019).[20]

CONCLUSION

We affirm the ruling of the trial court that tenants one, two, three, four, and five are not liable for tenant six's default.

*Affirmed.*

---

[19] PW filed suit more than six years after the 2015 arrearage.

[20] PW also assigned error to a purported inconsistency in the trial court's opinion letter with respect to the trial court's use of the break in the chain theory as to tenants four and five.  In light of our utilization of the right for the wrong reason doctrine, and our reliance on alternative grounds to uphold the ruling below, we need not address this point.